THE CITY OF TAMPA, A MUNICIPAL CORPORATION OF THE STATE OF FLORIDA, APPELLANT, vs. THE TAMPA WATERWORKS COMPANY, A CORPORATION UNDER THE LAWS OF FLORIDA, APPELLEE.

1. Companies deriving their authority from the legislature and invested with the franchise of supplying municipalities and their inhabitants with water through the instrumentality of pipes and mains laid in the public streets are, when exercising such functions, performing services of a public nature within the meaning of section 30, Article XVI, constitution of 1885, and their business is affected with a public interest, so as to subject them to regulation by requiring them to charge reasonable rates, and such regulation does not violate the "due process" clause of the Federal constitution.

2. The provisions of Chapter 5070, act approved May 31, 1901, are sufficient to authorize municipalities in this State to pass ordinances fixing reasonable rates to be charged for water supplied by a water company to the municipality and its inhabitants.

3. Every charter granted by the Legislature to the persons and corporations mentioned in section 30, Article XVI, consti-

tution of 1885, and every contract made with them by the legislature or by a municipality under its authority, are granted, made and accepted subject to and in contemplation of the possibility of the subsequent exercise of the power which by that section is declared to be vested in the legislature. The section mentioned not only becomes a part of every such charter or contract as much so as if written therein, but by implication it denies the authority of the legislature to estop itself by contract or to authorize a municipality to so bind it not to exercise the power thereby recognized whenever in its wisdom it shall think necessary to do so.

4. Section 30, Article XVI, constitution of 1885, reserves to the legislature the power to regulate by its own act, or through the instrumentality of a municipality, the rates to be charged by a water company supplying such municipality and its inhabitants with water so as to require such company to charge reasonable rates only for water supplied, and the exercise of this power does not deprive such company of its property without due process of law, nor does it impair the obligation of a contract between it and the city for higher rates, where such company was created and such contract was made subsequent to the adoption of the constitution of 1885.

5. Section 30, Article XVI, constitution of 1885, is applicable not only to persons and corporations engaged as common carriers in transporting persons and property, but also to persons and corporations performing other services of a public nature.

6. To the extent that section 30, Article XVI, constitution of 1885, affirms and declares full power in the legislature to do the things therein declared, and to the extent that it by implication deprives the legislature of the power to barter away that power, and to the extent that it becomes a part of every contract-made since the adoption of the constitution, by the legislature or by a municipality under its authority with the persons and corporations therein mentioned, it is self executing and needs no legislation to enforce it.

7. Where the matter presented for adjudication in a second suit arose after the termination of a former suit between the same parties and was in no manner involved in such former suit, the judgment therein is no bar to the second.

This case was decided by the Court In Banc.

Appeal from the Circuit Court for Hillsborough County.

*John P. Wall* and *Macfarlane & Glen,* for Appellant.

*P. O. Knight* and *Sparkman & Carter,* for Appellee.

### STATEMENT.

From the pleadings it appears that on September 20, 1887, the City of Tampa entered into a contract with W. A. Jeter and A. E. Boardman and their associates, constituting the Tampa Waterworks Company, for supplying the city and its inhabitants with water. By this contract the water company agreed to erect waterworks and to supply the city for public purposes in the manner therein stated for a period of thirty years, and the city agreed to pay $4,950 per annum, in equal semi-annual payments, for certain hydrant rentals, and if payments were not promptly made vouchers bearing 7 per cent interest were to be issued therefor. The water company agreed to supply water for certain public purposes in payment of city taexs and licenses for the first ten years, and for water used for fountains the city was to pay at the rate of not more than twenty-five cents per 100 cubic feet. The city agreed to levy an irrepealable tax sufficient to meet the annual payments, and if it should be author-

ized to levy a special tax, it obligated to do so annually and to keep the proceeds as a separate fund to be devoted to the payment of hydrant rentals. It further agreed to pass such ordinances as would protect the property of the water company and enforce such penalties and fines upon any person injuring the property as would when divided between it and the water company reimburse the latter for repairs made necessary by such injury, provided the damages should not exceed the fine limited by character. The city further gave the water company the exclusive right to streets and forbade the laying of pipes through the streets by others for the sale of water during the continuance of the contract, and the water company was accorded the privilege of laying a water pipe through the streets and alleys and crossing all streams in the city under certain restrictions therein declared. It was further agreed that the contract should continue in force for thirty years from the time the waterworks were completed and ready for duty, and that at any time after the expiration of ten years from the completion of the waterworks the city should have the right to purchase the waterworks, together with all appurtenances thereunto belonging, at the value thereof to be agreed upon by the parties, by giving the waterworks company notice of the intention to purchase one year in advance. It was further stipulated that if the parties could not agree as to the price to be paid for the waterworks and appurtenances, the price should be determined by arbitration in the manner therein provided. It was further agreed that should the city not wish to purchase at the expiration of thirty years, that the contract should be renewed for not less than five years, after which the franchise granted the water company should cease and be reopened for competition, at the option of

the city. It was further agreed "that the owners of the said waterworks may charge and collect quarterly in advance, for water furnished private consumers, prices not to exceed the following maximum rates and rules," followed by a list of maximum prices for purposes specified with certain regulations of the use of water by private consumers with a clause that "for all uses not herein specified the price shall be within the discretion of the waterworks company." It was further agreed that as the city grew or should for any reason desire more hydrants, that the water company should erect them and that the city should pay in addition to the $4,950, previously stated, $45.00 per annum for each additional hydrant under the conditions before stated, and that when the number of hydrants rented by the city should reach 200 the prices for all should be reduced to $40 per hydrant per annum. There are other provisions in the contract not necessary to be set out.

On September 29, 1887, the city passed an ordinance, No. 7, which set out in section 2 the contract of September 20, 1887, and ordained that Jeter and Boardman and their associates, successors and assigns should have the exclusive right and privilege of constructing, maintaining and operating waterworks for public and private supply of water within the city for a term of thirty years, together with the right to lay pipes, erect hydrants, fountains and such other structures and appurtenances in any and all of the streets and other public ways in the city as might be required for the distribution of water, and to make all necessary repairs, upon the conditions mentioned in the contract set forth in section 2. The ordinance prescribed certain regulations for the laying of pipes and other matters not necessary to be specifically men-

tioned, and obligated the city to locate upon the map of the mains at least 110 fire hydrants for its use, and required the water company in accordance with the contract to extend the water mains when directed so to do by the city, and on such extensions to place additional hydrants. Section 6 is as follows: "It is provided and ordained that the owners of said waterworks may charge and collect quarterly for water furnished private consumers, prices not exceeding the price named in section 2 of this ordinance." No prices were named in section 2, but the contract containing the provisions as to prices as follows: "As provided in section 2 of this ordinance was as stated made a part of that section. Section 7 is the city of Tampa shall levy and collect no municipal tax against the waterworks, upon its stock or earnings or upon material entering into their construction or operation during a period of ten years from the passage of this ordinance." Section 8 required the water company by or before January 1, 1888, to commence work upon said waterworks after having filed a written acceptance of the ordinance with the city clerk, and to complete the waterworks and have them in operation by January 1, 1889, and provided for forfeiture of the privileges granted upon non compliance with such requirements. Section 11 provided for the levy and collection annually of a tax of five mills to be applied exclusively to the payment of obligations of the city to the water company. Fines of not less than $25, nor more than $100, were prescribed for wilful and malicious injuries to the company's property. By section 12 the city approved, ratified and confirmed the contract mentioned in section 2, and undertook to guaranty payment of interest to accrue upon $82,500 of bonds to be issued by the water company, bearing interest at the rate of 6 per cent. per annum, payable semi-annually, for

a period of thirty years, such interest coupons to be made payable at the office of the city treasurer, and to be receivable for taxes and other debts and obligations due the city, and it was provided that the coupons when paid by the city treasurer should be a receipt and acquittance in discharge of said sum of $4,950 agreed to be paid by the city annually to the water company for the rental of 110 hydrants, to the extent and amount of the coupons so paid.

On June 6, 1889, the city passed another ordinance, No. 42, which, after reciting the rapid growth of the city, directed the water company to extend its mains and provided for the erection of twenty-seven additional hydrants for which the city agreed to pay the sum of $1,215 per annum as provided by the original contract. Section 12 of the former ordinance was amended so as to read, after the first sentence, to the effect that the city ratified, approved and confirmed the contract entered into with the water company with the amendments contained in that ordinance, and obligating the city to guaranty the interest to accrue upon bonds which might be issued by the water company on January 1, 1890, to an amount not exceeding $102,000, bearing interest payable semi-annually at 6 per cent., for the period of the unexpired term of the franchise granted the water company, the interest coupons to be made payable, less the exchange, in the city of New York, or at the office of the city treasurer, and to be receivable for taxes and all other debts and obligations of the city.

On February 6, 1890, the city passed another ordinance, No. 51, which recited the two former ordinances and stated that questions had arisen as to the true intent and meaning of the provisions in ordinance No. 7, by which the city reserved the right to purchase the waterworks

property, whereby the company had encountered difficulty and been delayed in raising money needed to complete the waterworks, and that it had become necessary to change the time of the issuance of the bonds proposed to be issued by the water company, and that it was to the interest of the city that the waterworks should be completed at as early a date as possible, and desirable that the right of the city should be free from doubt, and ordained that the true intent and meaning of ordinance No. 7 was to reserve to the city the right to purchase at any of the periods therein designated all the property of every kind belonging to the waterworks company, including the franchises and privileges granted by the former ordinance and then enjoyed by the company, and that in case of failure to agree upon the price, that the value of the property, including the franchises and privileges, should be determined by arbitrators in the manner provided in the former ordinance. It further ordained that the provisions of ordinance No. 42, looking to the issue of $102,000 of bonds by the water company on January 1, 1890, and to the payment of interest on same in New York, be amended so that said amount of bonds might be dated March 1, 1890, and the interest made payable in Batlimore or such other place as might be designated by the water company, provided that the amount of bonds and the interest to be paid should not be altered, and that the first payment of rental should be on July 1, 1890. It was further ordained that if the city should exercise the reserved right to purchase the property of the water company and same should be mortgaged to secure bonds of the company not then due, the city should have the right to have the amount of the outstanding bonds deducted from the price to be paid, the amount so deducted to be payable by the city only at maturity of the bonds.

On January 24, 1899, the city filed its bill in chancery against the water company in the Circuit Court of Hillsborough county, setting forth therein and making exhibits thereto ordinances Nos. 7, 42 and 51, alleging, in substance that the water company had failed to furnish sufficient water pressure, or water in sufficient quantity to give first class fire protection; that the city had no right or power to contract with the company to furnish water for a period of thirty years, or bind itself to guaranty interest on the company's bonds, or to fix the rates to be charged consumers for a period of thirty years; that it had the right at any time to change such rates and to substitute lower rates therefor; that the company had not at all times furnished the pressure or quantity or quality of water as agreed; that the contract between the company and the city was null and void and should be cancelled; that under and by virtue of Ordinance No. 199 passed by the city and approved February 26, 1898, providing for the repeal of ordinances Nos. 7 and 42, said ordinances Nos. 7, 42 and 51 had been repealed, and praying that the contract and ordinances Nos. 7 and 42 and 51 be declared null and void and in no way binding upon the city; that the city be released from all its obligations under said contract and ordinances; that so much of the contract as provided for an exclusive right on the part of the company to maintain its mains in the city and binding the city to take water from the company for a term of thirty years, at the rates therein mentioned be declared null and void; that so much of the contract as stipulated that the city should guaranty the payment of the interest on the bonds issued by the company be declared null and void; that so much of the contract as provided for the taking of water by the citizens at the rates stipulated in the contract, and the right of the company to cut the wa-

ter off from the premises and the payment therefor of fifty
cents to have the same turned on again might be declared
null and void, and that the entire contract be set aside
and declared null and void, and for such further relief
in the premises as might seem meet and proper. The wa-
ter company filed its answer to this bill admitting the
passage of the ordinances as therein set forth, but deny-
ing that it had failed to furnish a sufficient quantity of
water to give the pressure provided for by the contract,
or to give first-class fire protection, claiming that it fur-
nished water both in quantity and quality as it had
agreed, and that it had complied in every particular with
its contract. The answer denied that the contract was
null and void on account of anything mentioned in the
bill or that it should be cancelled therefor; denied the
right and power of the city to pass or enforce ordinance
No. 199, and alleged that said ordinance impaired the ob-
ligation of said contract, and was null and void because it
violated the constitution of Florida and also the consti-
tution of the United States, especially Article I, section
10, and the Fourteenth amendment thereto. The answer
also alleged as a ground of demurrer that there was no
equity in the bill and claimed the same benefit as if the
company had demurred to the bill.

On October 4, 1899, shortly after the answer to this bill
was filed, the city and the water company entered into an
agreement whereby the water company agreed that from
and after January 1, 1900, it would reduce the water rates
specified in the contract to the rates therein
specified, including a reduction on fire hydrants
from $40 to $35, with the privilege of placing thirty addi-
tional hydrants immediately and certain others in the fu-
ture, in consideration of which the city agreed to dismiss

39 S C

all suits pending between it and the company, to pass and enforce certain ordinances to protect the company's property and for other purposes, to pay for the additional hydrants at the rental specified, and that during the life of the contract the city would not enter into competition with the company in supplying water to the city and its inhabitants; and further agreed that on failure to pay hydrant rentals and water charges for the space of twelve months after same become due, all the rates and charges set out in the original contract between the city and the water company should at once become operative and be in force, and the reductions specified in the last agreement to be thereafter of no further force or effect. This last agreement was not incorporated into or ratified by an ordinance, but the city passed a resolution, approved the same day, incorporating the contract therein and directing that it should be executed by the mayor, president of the council and city auditor on behalf of the city, and that the agreement should become operative immediately according to its terms. The resolution recited that there was in existence and force a valid contract between the city and the water company; that such contract was thereby recognized by both parties as binding on them; that there was then pending in chancery in the Circuit Court of Hillsborough county certain litigation between the city and the water company over the construction of the contract; that it was to the mutual interest of both parties that said litigation should be terminated, and that the parties had come to the agreement before stated. In pursuance of the agreement incorporated into the resolution the city by its attorney filed a praecipe for the dismissal of the chancery suit then pending in the Circuit Court of Hillsborough county, whereupon the clerk of the court entered an order dismissing same as follows: "Oct. 9th

1899, Praecipe for dismissal, and suit hereby dismissed. H. L. Mitchell, Clerk, by C. M. Knott, D. C."

On December 20, 1901, the city passed an ordinance whereby it was declared to be unlawful for any individual, company or corporation furnishing water to the city or its inhabitants to charge or collect any higher rates for water than those specified in that ordinance, from and after January 1, 1902. Punishment by fine or imprisonment, or both, for violations of the ordinance was imposed. Section 2 of that ordinance provides "that the maximum rates to be charged by any individual, company or corporation furnishing water to the city of Tampa and the inhabitants thereof shall be as follows," specifying maximum rates which are less than those mentioned in the original contract and subsequent modifications thereof.

On December 6, 1901, the water company filed its bill against the city which, as subsequently amended, set forth the foregoing facts and alleged that the city, being authorized by its charter to obtain a supply of water for public purposes and also for its inhabitants, entered into the contract with Jeter and Boardman before set out and thereby agreed that Jeter and Boardman and their associates should become incorporated under the laws of this State for the purpose of supplying the city and its inhabitants with water, and that upon the formation of such corporation the contract should be assigned to it; that afterwards Jeter and Boardman and their associates formed the water company and assigned and transferred all the rights, franchises and privileges conferred upon them by the city to said corporation; that from time to time thereafter the city ratified and confirmed the original contract made in 1887, and afterwards, on June 6, 1899, and again on October 4, 1899, confirmed the contract to

the water company with certain changes therein; that at sundry other times since the making of the contract the city confirmed, ratified and recognized said contract as binding upon both parties; that the company was incorporated under the general inncorporation laws of Florida as they existed in 1887, solely for the purpose of engaging in the business of furnishing a public and private supply of water to the city and its inhabitants, and acquired all the rights, powers and privileges conferred upon corporations of a like nature at the time of its incorporation, among which were those granted by the statute then in force (sec. 30, p. 234, McClellan's Digest), which provided that "any corporation organized and put into successful operation under this chapter shall have exclusive privileges for the purposes of its creation for the term of twenty years from the date the corporation commenced to carry out in good faith the terms of its articles of incorporation, *provided, however,* that this instrument shall not so operate as to divest any future legislature of those powers of government which are inherent and essential attributes of sovereignty, to-wit: the power to create revenue for public purposes, to provide for the common defense, to provide safe and convenient ways for the public necessity and convenience and to take private property for the public use and the like;" that in 1888, prior to any change in the statutes, the company put into successful operation its waterworks and continued same up to the filing of the bill; that the contract was legal and valid, protected from impairment by the constitution of Florida, and particularly by the constitution of the United States and the amendments thereto; that the company performed all the covenants and agreements on its part as set out in said contract, and was at the time of filing the bill performing in good faith the covenants on its part con-

tained in said contract; that the service furnished had been accepted by the city, and the plant erected was within the time limited in the contract duly accepted and approved by the city; that by the original contract certain rates for furnishing water to the city and its inhabitants were agreed upon and incorporated therein which were the sole consideration moving it to the undertaking and carrying out of said contract; that the prices to be paid for water by the city and the inhabitants were fixed for the entire period of thirty years during which the contract was to be in existence; that the company had up to the time of the amended contract of October 4, 1899, charged and collected from the city of Tampa and from its inhabitants the amounts specified to be charged in said original contract; that at the time the waterworks plant was installed, the city was a very small village; that the inducement to invest money in the plant was that the rates so fixed in the contract should be charged during the entire time thereof, the company hoping and expecting that the city would so grow that it would be able to make a reasonable interest on its investment; that by October 4, 1899, the city had largely grown and increased in size; that the company at the request of the city investigated the conditions existing at that time, and by a mutual agreement of that date decided that it could reasonably make certain reductions in the rates which it was authorized under its original contract to charge both the city and its inhabitants, and by mutual agreement that day entered into the rates were changed in certain respects mentioned in the resolution of October 4, 1899; that since making said last mentioned contract the company had been furnishing water to the city and its inhabitants at the rates therein specified, which rates had been

paid by the city and its inhabitants; that on December 20, 1901, the city disregarding its obligations to the company and in contravention of the constitution and laws of the State, and particularly in violation of that section of the constitution of the United States which provides that no State shall pass any law impairing the obligation of a contract, and particularly in violation of the fourteenth amendment to the constitution of the United States, passed and had signed by the mayor the ordinance reducing water rates before mentioned; that said ordinance had been published as required by the charter of the city and if legal and valid would go into effect on or about December 28, 1901; that the city did not have power to pass said ordinance; that the ordinance violates the contract rights of the company, constitutes the taking of its property without due process of law, and impairs the contract theretofore entered into between it and the city. The bill also alleged that the matters set forth in the bill filed by the city against the company in 1899, and the answer thereto, including the question as to the legality of the contract in all its details, as also the right to contract for a period of thirty years, and the right of the city to change the rates to be charged consumers as fixed in said original contract without the company's consent, were raised and presented in said proceedings, and were, by reason of the order and decree finally dismissing said suit, determined and adjudicated against the contention of the city; that said former bill and the proceedings and order dismissing same remain determined, in full force and are *res adjudicata;* that said determination was the law of the case; that the city had no right to interfere with said contract or in any way to reopen the questions so adjudicated in this or any other suit with the company.

The bill further alleged that the company's only remedy was in a court of equity; that the law furnished it no adequate remedy or relief in this; that by said ordinances of December 20, 1901, the charging of the contract rates for water was made a penal offense against the company; and numberless quasi-criminal prosecutions would grow out of the attempt to enforce the company's legal rights; that the inhabitants of the city acting under the supposed right of the city to so invalidate water charges would decline to pay the contract rates and the company would be required to institute numberless suits in order to collect the amounts of money due it; that the company would suffer irreparable damage unless the court of equity should interpose to protect its rights.    The bill prayed that the city, its agents and officers be enjoined temporarily during the pendency of the suit, and perpetually at the hearing, from enforcing or attempting to enforce the ordinance reducing rates for furnishing water to the city and its inhabitants, for general relief and for subpoena.

On December 26th, 1901, temporary injunction issued as prayed.

The city filed its demurrer to bill, incorporating therein the following grounds:  1st.  The bill was wholly wanting in equity.

2nd.  The ordinance of December 20, 1901, was valid under Chap. 5070, acts of 1901.

3rd.  The alleged contracts between the city and the company were *ultra vires* and void.

4th.  The city had no authority to agree upon water rates for the period alleged in the bill.

5th.  The company has a full, adequate and complete remedy at law.

6th. The alleged contracts are unconscionable and contrary to public policy.

7th. If the company acquired any rights under the alleged contracts, they were acquired subject to future legislation, and such legislation can not be construed to impair the obligation of a contract.

8th. The company acquired no rights by virtue of its alleged incorporation.

9th. The former proceedings set up as a bar did not terminate in a final adjudication on the merits, do not sustain a claim of *res adjudicata,* and the city could not bind itself to impart validity to the alleged contracts by dismissing its bill as alleged.

Thereafter the city filed its motion to dissolve the temporary injunction upon grounds similar to the first eight grounds of the demurrer, and the motion and demurrer coming on for hearing on December 29, 1902, the court overruled the demurrer, and denied the motion to dissolve, and, the city declining to plead further, a final decree was entered perpetuating the temporary injunction thetofore granted and adjudging costs against the city, from which decree the present appeal was entered by the city. The errors assigned complain that the court erred in the following particulars: 1. Granting the temporary injunction.

2. Overruling the demurrer to the bill.

3. Denying the motion to dissolve the temporary injunction.

4. Granting the final decree perpetuating the injunction.

5. Holding by its decrees that the company was entitled to any relief.

CARTER, J.    (*after stating the facts.*)

This cause was referred to and the oral arguments heard by Division B. of this court, but the questions involved were by that Division deemed of sufficient importance to require the case to be considered and decided by the court *in banc.*

Although one of the grounds of demurrer to the bill was that the remedy at law is plain, adequate and complete, that ground is not insisted upon in this court. Indeed, counsel for the city state in their briefs that the city desires to waive any technical objections to the sufficiency of the bill, as well as to the jurisdiction of a court of equity in the premises.

By Chapter 3779, act approved June 2, 1887, the city of Tampa was constituted a body corporate and politic, and in section 1 it was given power to sue and be sued, to plead and be impleaded, to purchase and hold real, personal and mixed property, and to dispose of same for the benefit of the city, and "to do all other acts for that purpose as material persons."

By section 2 it was provided that the "city council shall have power to make, ordain, establish and execute for the government of said city such ordinances in writing * * * not inconsistent with the constitution or laws of this State or of the United States * * * as they shall deem necessary, * * * to provide for the establishment of waterworks, * * * to prescribe and maintain a system of drainage and sewerage, * * * to organize and provide a fire department, and to regulate the same so as to protect the city from fire, * * * and to do and regulate any other matter or thing that may

tend to promote the peace, health, welfare, prosperity and morals of the said city, * * * and in addition to the powers hereinbefore enumerated the said city council shall have all the powers and perform all the duties imposed upon them by the laws of Florida now in force or which may hereafter be enacted, providing for the creation and government of cities and towns."

By section 12 it was provided that "all laws now in force or that may hereafter be enacted for the government of cities and towns, except in so far as they may conflict with the provisions of this charter, shall apply to the said municipality."

The general law for the incorporation of cities and towns in force at the time the contract between the city and Jeter and Boardman was made, provided that a city or town organnized under its provisions should be "a body corporate, with full power and authority to take and hold property, real, personal and mixed, to control and dispose of the same for the benefit and best innterests of the corporation aforesaid, to sue and be sued, implead and be impleaded, and to do all such other acts and things as are incident to corporate bodies" (sec. 8, McClellan's Digest), and that "the city or town council shall have power * * * to construct drains and sewers" (sec. 17 idem), and "to make and sink wells, erect pumps, dig drains; to pass all necessary laws to guard against fire * * * and to do and perform all such other act or acts as shall seem necessary and best adapted to the improvement and general interest of the city or town" (sec. 21 idem). Chapter 3605, act approved February 16, 1885, empowered cities and towns to "levy and collect a special tax annually for waterworks and fire protection upon all property within the corporate limits," not to exceed five

mills, to be levied by a two-thirds vote of the council af-
ter publication of notice of the inntention so to do. The
provisions quoted were the only statutory provisions in
force relating to the power of the city of Tampa to con-
tract for water for the city and its inhabitants at the time
the contract with Jeter and Boardman was made. The
city contends that these powers, some being in the nature
of "general welfare" clauses, others special with regard
to the establishment of waterworks and protection from
fire, interpreted according to the rule of construction fol-
lowed in Mernaugh v. City of Orlando, 41 Fla. 433, 27
South. Rep. 34, did not authorize the city to delegate to a
private corporation by contract the authority to construct
own and operate a water plant, but that the power given
required it to provide for establishing waterworks by ar-
ranging for its own ownership and operation of water-
works.

The city also contends that even of the power to con-
tract with the water company be found to exist, that pow-
should not under the rules of construction announced in
in Jacksonville Electric Light Co. v. City of Jacksonville,
36 Fla. 229, 18 South. Rep. 677, and Florida Cent. &
P. R. Co. v. Ocala St. & S. R. Co., 39 Fla. 306, 22 South.
Rep. 692, be held to authorize the making of a contract to
continue for a period of thirty years with provision for
a renewal for a further period of five years, nor to author-
ize the fixing of rates to be paid for the entire period not
only for water used by the city, but by its innhabitants.

The city further contends that even if the power grant-
ed enabled it to make the contract, it had not under the
rulings in Florida Cent. & P. R. Co. v. Ocala St. & S. R.
Co., 39 Fla. 306, 22 South. Rep. 692, and Capital City
Light & Fuel Co. v. City of Tallahassee, 42 Fla. 462, 28

South. Rep. 810, power to grant an exclusive franchise to the water company, nor under the ruling in City of Tampa v. Kaunitz, 39 Fla. 683, 23 South. Rep. 416, power to exempt the property of the company from taxation for the consideration expressed in the contract, nor power to guaranty interest on the company's bonds because forbidden by section 10, Article, IX, constitution of 1885, nor power to agree to levy the special tax of five mills, as such tax could under Chapter 3605, acts of 1885, be levied only after publication of the notice required by that statute, nor power to agree to divide fines with the water company, because contrary to public policy, and that the subsequent agreement to compensate the company for its franchise upon purchase of the property was without consideration and beyond the power of the city to make, and that the agreement of October 4, 1899, was void because made without compliance with the provisions of Chapter 4146, acts of 1893, requiring agreements between cities and water companies to be ratified by a majority of the freeholders of the city, and that these illegal provisions, being inseparable from the valid provisions, taint the entire contract with illegality and render it void. In the same connection it is urged that the bill alleges that the fixing of the stated maximum rates for the entire period was the sole consideration upon which the water company entered into the contract, and that as the city had no power to fix those rates, there was no consideration to the water company and consequently the entire contract is necessarily invalid; and further, that the provision for the exclusive franchise in the water company is not merely *ultra vires,* but illegal, and being an inseparable part of the consideration, renders the entire contract void.

The water company contends that the statutory powers we have quoted gave the city authority to contract with a private corporation to establish and operate waterworks, and to agree in such contract upon rates for the public and private supply of water during the period provided by the contract; that the contract so entered into was valid, and likewise every provision thereof when properly construed, and that even if originally beyond the power of the city to make, it has subsequently been ratified and confirmed by both the city and the legislature. Other contentions of the parties will be noticed further on.

The questions presented are interesting and novel, but we shall not undertake to discuss and decide them all at this time, as we do not find it necessary to do so. In the discussion of the case we shall assume, without deciding, that the powers granted the city were sufficient to authorize it to contract with the water company for a public and private supply of water. We shall assume that the powers asserted to have been granted were sufficient to enable the city to insert clauses fixing the rates and obligating the city to pay those rates for water used by it during the entire contract period, although this is a doubtful question. We shall assume that the powers asserted to have been granted were sufficient to enable the city to insert a clause fixing the rates to be paid by individuals for water use during the entire contract period, although this is a very doubtful question. We shall also assume that the proper construction of the provisions of the contract relating to maximum rates to be paid for water by individuals requires us to hold that the city thereby granted the water company the right to fix the rates to be paid at such sums as it saw proper, not to exceed the maximum established by the contract, and thereby, if it could lawfully do so,

surrender the governmental power to require the company to charge reasonable rates only, which is also a very doubtful question.

Assuming that the statutory powers quoted were broad enough to authorize the city to contract with the water company for a public and private supply of water for a period of thirty years, and to fix the rates to be paid by the city and individuals for the entire contract period, two questions arise. Was the obligation of the contract so made impaired by the ordinance reducing those passed December 20, 1901? Would the enforcement of that ordinance result in depriving the company of its property without due process of law? In the discussion of these questions it must be borne in mind that there is no allegation in the bill that the rates fixed by the ordinance of December 20, 1901, are not reasonable, and our decision must, therefore, be based upon the assumption that the rates so fixed are reasonable. The questions presented for decision may, therefore, be more accurately stated thus: Does the ordinance of December 20, 1901, fixing reasonable rates to be charged by the water company impair the obligation of the contract between it and the city, whereby higher rates were fixed for a period not yet expired? Will the enforcement of that ordinance result in depriving the company of its property without due process of law?

It has frequently been held, and is unquestionably the law, that unless prohibited by constitutional limitations, or restrained by valid contract obligations, the legislature has power to require water companies to supply their customers, whether cities or individuals, at reasonable prices to be fixed by the legislature or by municipal authorities. Such companies, deriving their authority from the legis-

lature and being invested with the franchise of supplying
municipalities and their inhabitants with water through
the instrumentality of pipes and mains laid in the public
streets, are performing services of a public nature within
the meaning of section 30, Article XVI, constitution of
1885, and their business is "affected with a public inter-
est" so as to subject them to regulation by requiring
them to charge reasonable rates, and such regulation does
not violate the "due process" clause of the Federal consti-
tution.   Spring Valley Water Works v. Schottler,   110
U. S. 347, 4 Sup. Ct. Rep. 48; Freeport Water Company
v. Freeport City, 180 U. S. 587, 21 Sup. Ct. Rep. 493; Rog-
ers Park Water Company v. Fergus, 180 U. S. 624, 21 Sup.
Ct. Rep. 490. See, also, Los Angelis v. Los Angelis City
Water Company, 177 U. S. 558, 20 Sup. Ct. Rep. 736;
Mayor etc. of City of Knoxville v. City of Knoxville Water
Co., 167 Tenn. 647, 64 S. W. Rep. 1075.  See, also, Knox-
ville Water Co. v. Knoxville, decided by the United States
Supreme Court, October term, 1902.  23 Sup. Ct. Rep. 531.

The ordinance of December 20, 1901, was passed in pur-
suance of the power granted by Chapter 5070, act approv-
ed May 31, 1901, which provides "that the corporate au-
thorities of any city, town or village now or hereafter
incorporated under any general or special law of this
State in which any individual, company or corporation
has been, or may hereafter be, authorized by such city
town or village to supply water to such city, town or vil-
lage and the inhabitants thereof, be and are hereby em-
powered to prescribe by odinance maximum rates and
charges for the supply of water furnished by such individ-
ual, company or corporation to such city, town or village
and the innhabitants thereof; such charges to be just and
reasonable; provided, that this act shall not be so con

strued as to impair the validity of any valid contract here-
tofore entered into between any city, town or village and
any person, firm or corporation for the supply of water
to such city, town or village or its inhabitants. But this
act shall not be held to validate any contract heretofore
made." It is not claimed that this act does not grant
the power to pass the ordinance of December 20, 1901, pro-
vided that ordinance does not impair the validity of the
contract with the water company or deprive it of its prop-
erty without due process of law. The act is clearly suffi-
cient to grant the power stated. Freeport Water Compa-
ny v. Freeport City, *supra*.. In order to determine wheth-
er the ordinance impairs the validity of the contract with
the water company, we must determine the nature of that
contract.

The city contends that at the time the water company
and the city were incorporated, and at the time the con-
tract between them was made, there existed certain provi-
sions of our present constitution which entered into and
became a part of the contract between the parties, and
that because of these provisions the legislature could
grant the power contained in Chapter 5070, above quoted,
without impairing any obligation of the contract. These
provisions are the first clause of section 8, Article VIII,
that "the legislature shall have power to establish and
to abolish municipalities, to provide for their government,
to prescribe their jurisdiction and powers and to alter or
amend the same at any time," and section 30, Article
XVI, that "the legislature is invested with full power to
pass laws for the correction of abuses and to prevent un-
just discriminations and excessive charges by persons and
corporations engaged as common carriers in transporting
persons and property, or performing other services of a

public nature, and shall provide for enforcing such laws by adequate penalties or forfeitures." Without expressing an opinion as to whether the provisions of sectionn 8, Article VIII, accomplish the result claimed, we are satisfied that with section 30, Article XVI of the constitution in force now and at the time the city and water company were incorporated, and at the time the contract was made, the fixing by ordinance of reasonable rates for the supply of water to the city and its inhabitants in pursuance of the power conferred by Chapter 5070 neither violates any contract right of the water company, nor deprives it of its property without due process of law. The constitution of 1885, containing this provision, went into effect on January 1st, 1887. See ordinance No. 1 of the convention that framed it. The charter of the present city of Tampa, as well as the charter of the water company, were granted and the contract in question was entered into after the constitution went into effect, and the powers granted to the city and the water company to contract, as well as the contract entered into, must be construed in connection with and limited by the constitutional provision referred to. This provision was considered and partially construed in State ex rel. Lamar v. Jacksonville Terminal Company, 41 Fla. 377, 27 South. Rep. 225. It was there said that "it does not purport to confer a power or to point out the manner in which a power shall be exercised. The section was inserted in response to a popular demand for some provision upon the subject. It does not grant the legislature a power. It expressly recognizes a power and declares that it does exist. The provision is a specified declaration that the power exists in the legislature to be exercised at any time, and because of its importance, and possibly to guard against the misinterpretations of other provisions to impair or deny the power,

it was specifically mentioned and declared in the consti-
tution." The power mentioned in this section is full
power; a continuing, ever present power. Being irrevo-
cably vested by this section, the legislature can not divest
itself of it. Neither can it bind itself by contract, nor
authorize a municipality—one of its creatures—to bind
it by contract, so as to preclude the exercise of this power
whenever in its judgment the public exigencies demand
its exercise. Full power can not exist, if by contract
that power can be curtailed or impaired. Without this
section the power to regulate rates would exist under the
general grant of legislative power in section 1, Article
III, but such power could be surrendered by a contract
made by the State or by a municipal by its authority.
With this section in force the power to surrender by con-
tract the right to regulate rates is taken away, for the au-
thority to surrender can not co-exist with the ever present
continuing power to regulate, which is declared by this
section to exist in the legislature. The section in ques-
tion does not operate to prevent the legislature from mak-
ing contracts itself, nor from authorizing municipalities
to make them and in and by such contracts stipulating
for certain rates which will be valid and binding obliga-
tions so long as the legislature does not exercise or au-
thorize municipalities to exercise the power to prevent
excessive charges which is declared by the section to be
vested in the legislature. But every charter granted and
every contract made by the legislature, or by a munici-
pality under its authority, are accepted and made subject
to and in contemplation of the possibility of the subse-
quent exercise of the power to prevent excessive charges
which by this section is unalterably and irrevocably vest-
ed in the legislature. The section not only becomes a part
of every such contract, as much so as if written therein,

but by implication it denies the authority of the legisla-
ture to bind itself either by a contract of its own making,
or one made by a municipality under its authorization,
not to exercise the power thereby recognized whenever in
its wisdom it should think necessary so to do. The effect
of this section is to reserve to the legislature full power
at all times, notwithstanding any supposed contract not
to exercise it, to require water companies and others
mentioned in the section to comply with their common
law obligation to supply their customers at reasonable
rates, and such being its construction, we do not see that
the contract between the water company and the city is
impaired by the ordinance of December 20, 1901, nor that
the water company is thereby deprived of its property
without due process of law. Skaneateles Water Works
Company v. Skaneateles, 184 U. S. 354, 22 Sup. Ct. Rep.
400. We have not been able to find an authority constru-
ing a constitutional provision precisely like the one we
are considering, but we think the decision of the Supreme
Court of the United States in Spring Valley Water Works
v. Schottler, *supra,* fully sustains the views we announce,
and that the decisions holding that constitutional or stat-
utory provisions to the effect that charters granted shall
be subject to alteration, amendment or repeal become
parts of contracts made in the form of characters, enforce
the same principles we apply in this case. Tiedeman on
State and Federal Control of Persons and Property, sec-
tions 208-212; Northern Central Railway Co. v. State of
Maryland, .... U. S. ....,23 Sup. Ct. Rep. 62; Bienville
Water Supply Company v. City of Mobile, 186 U. S. 212,
22 Sup. Ct. Rep. 820 S. C. 16 Am. & Eng. Crop. Cas. (N.S.)
534; Covington v. Kentucky, 173 U. S. 231, 19 Sup. Ct.
Rep. 383; Citizens' Savings Bank of Owensboro v. Owens-
boro, 173 U. S. 636, 19 Sup. Ct. Rep. 530; Louisville Wa-

ter Co. v. Clark, 143 U. S. 1, 12 Sup. Ct. Rep. 346; Sioux City St. Ry. Co. v. Sioux City, 138 U. S. 98, 11 Sup. Ct. Rep. 226; State ex rel. Cream City Ry. Co. v. Hilbert, 72 Wis. 184, 39 N. W. Rep. 326. The water company contends that the section we are construing applies only to common carriers engaged in transporting persons and property or in performing other services of a public nature, but we think the section applies to persons and corporations engaged as common carriers in transporting persons and property, and also to persons and corporations performing other services of a public nature. This was the construction placed upon it in State ex rel. Lamar v. Jacksonville Terminal Company, supra, and we have no doubt it is correct.

It is also contended by the water company that the section referred to is not self executing, and therefore can not be enforced without legislation, but we fail to see the force of this contention. That the provision became effective on January 1, 1887, is not, and can not successfully be, denied. It does not in and of itself purport to fix reasonable rates, nor to prevent abuses and unjust discriminations, and in that respect it is not self executing, but to the extent that it affirms and declares full power in he legislature to do those things it is effective without legislation, and to the extent that it by implication deprives the legislature of the power to barter away that right it is effective without legislation, and to the extent that it becomes a part of every contract made by the legislature or by a municipality under its authority with the persons and corporations therein mentioned the section is effective without legislation. A constitutional limitation intended as a restraint upon the power of t' islature upon so important a subject that would not become effective until the legislature saw proper to legislate

it into effectiveness would be an anomaly in constitution-al law. We do not think this provision is of that charac-ter.

Having disposed of the case upon the assumption that the contract between the city and the water company was authorized by a proper construction of the powers grant-ed the city by the legislature, it becomes unnecessary to missed on praecipe of counsel for plaintiff in error.

conduct on the part of the city, and by certain provisions of the Revised Statutes and Chapter 4883, acts of 1889, which it is claimed validated the contract. The water company contends, however, that the order dismissing the former bill brought by the city against it, operated as an adjudication of all the matters sought to be litigated in that suit, including the right of the city to reduce wa-ter rates, the only point in issue here. Without deciding that an order of dismissal made by the clerk upon prae-cipe of counsel for complainant will have the effect con-tended for, but assuming for the purposes of this case that it does, we fail to see that the question now in issue was involved in the former proceedings. In that case the city had attempted to repeal the ordinances constituting the contract between it and the water company, and also sought to have the contract declared void because of a want of power to insert certain provisions therein, and to have the contract cancelled upon the ground that the com-pany had failed to perform it, but the question of the pow-er of the city under Chapter 5070, acts of 1901, or any similar previous statute to reduce water rates from the contract price to a less but reasonable rate, which is the only question involved here, was in no manner involved in those proceedings. The issues in the two cases are not,

for the reasons stated, the same, consequently the supposed adjudication in the former proceeding can have no effect upon the present case.

The interlocutory decrees granting the temporary injunction, and overruling the demurrer to the bill, as well as the final decree perpetuating the injunction and awarding costs against the city, are reversed, and the cause remanded with directions to sustain the demurrer to the bill, and for such further proceedings as may be agreeable to equity practice and consistent with this opinion.

SHACKLEFORD, J., being disqualified, took no part in the consideration of this case.