## ANCHOR HOCKING CORPORATION, Plaintiff,

v.

## The JACKSONVILLE ELECTRIC AUTHORITY, Defendant.

### No. 75–319–Civ–J–S.

United States District Court,
M. D. Florida,
Jacksonville Division.

Aug. 10, 1976.

---

Davisson F. Dunlap, Orlando, Fla., for plaintiff.

William Lee Allen, Jacksonville, Fla., for defendant.

## ORDER

CHARLES R. SCOTT, District Judge.

In this diversity action for breach of contract, plaintiff has moved to strike defendant's first and second affirmative defenses as insufficient as a matter of law. In July, 1968, Anchor Hocking Corporation ('Anchor Hocking'). the plaintiff, entered into a requirements contract for electricity with the City of Jacksonville, Florida. On October 1, 1968, pursuant to Florida Laws 1967, Chapter 67–1569, the Jacksonville Electric Authority ('JEA') was established, to which the City of Jacksonville transferred its contract with Anchor Hocking; and JEA assumed the correlative contractual obligations. Florida Laws 1967, Chapter 67–1569, § 6. Thereafter, Anchor Hocking and JEA, the defendant, continued performing their respective duties under the contract.

Section 2 of the contract required a mandatory one-year effective life, after which there was reserved to either party a right to terminate the contract unilaterally upon ninety days' notice. Section 3 of the contract established a scale of monthly rates for electricity which JEA would charge Anchor Hocking, depending on the amount of kilowatts used. In addition, a formula was provided by which JEA could adjust upward or downward monthly its energy charges to Anchor Hocking, on a one-to-one ratio, for all costs that exceeded or fell below the agreed upon limits of a sliding twelve-month average of fuel costs to JEA. Finally, Section 3 allowed for a direct, one-to-one adjustment upward of energy charges by JEA for all increased taxes on JEA, ad valorem or non-ad valorem, that are allocable either to JEA's property that is used for electrical utility service, or to its production of electrical utility service.

The question presented by Anchor Hocking's motion to strike JEA's first affirmative defense is whether the contract between them, which is the subject matter of this action, is unenforceable because it is void. The question is purely one of law. There are three different legal principles, exemplified by three groups of cases under Florida law, that are involved in answering this question.

First, if the Florida Legislature has delegated, by general statute, its inherent, plenary authority over utilities' services to a city, any subsequent contract between that city and a utility that would bind the city inflexibly and unreasonably, preventing the exercise of its delegated power, is ultra vires and therefore void ab initio. The progenitor of later Florida decisions is *City of Tampa v. Tampa Waterworks Company*, 45 Fla. 600, 34 So. 631 (1903). The Florida Constitution of 1885 contained a provision which the Supreme Court of Florida construed as recognizing an inherent, plenary power of the Legislature over utilities, and imposing a continuing, unrelinquishable duty to exercise that power. *Id.* at 639. In 1887, the city and the water

company entered into a thirty year contract for water at fixed rates to be charged by the water company; and the water company, in reliance on the terms of the contract, built its waterworks system. In 1901, however, pursuant to the State constitutional provision, and another provision concerning municipalities, the Florida Legislature enacted a general statute authorizing cities to prescribe by ordinance the maximum water rates. Later in 1901, the city passed an ordinance setting maximum water rates and making it unlawful for any company to charge rates in excess of those set by the city. The water company sued to enforce the contract, claiming that the city's ordinance impaired the contract between them, in violation of the Federal Constitution, Article I, Section 10, cl. 1.

On the city's appeal from a judgment for the water company, the Supreme Court of Florida held that the pre-existing provision of the State Constitution subjected every subsequent contract involving the State or a municipality to it. The provision became an implicit provision in any subsequent contract, denying the right of any contract to bind the State or a municipality from the obligatory exercise of the power recognized under that provision. *Id.* Consequently, insofar as the particular contract between the city and the water company purported to bind unalterably the city for thirty years, the contract was ultra vires and void from the outset. There was, therefore, no valid contract to be impaired. The United States Supreme Court, *Tampa Water Works Company v. City of Tampa*, 199 U.S. 241, 26 S.Ct. 23, 50 L.Ed. 170 (1905), reviewing that decision, held that the view of the Supreme Court of Florida was a possible and therefore permissible one. Hence, the thirty year contract did not bind the city.

*City of Clearwater v. Bonsey*, 180 So.2d 200 (2d D.C.A.Fla.1965), was a case where the Pinellas County Commissioners sought a declaratory decree concerning the legal effect of a contract which had been entered into by the county and the City of Clearwater more than ten years earlier. In 1953, the Florida Legislature had passed a special

act authorizing Pinellas County to enlarge its water supply and distribution systems, to establish rates for it, and to enter into contracts with respect to it. Subsequently, Pinellas County and the City of Clearwater executed a thirty year contract, at specific, fixed rates. In 1963, the county sought to raise rates more than 300% to reflect current costs, if it were not precluded contractually from doing so. The Second District Court of Appeal, citing *City of Tampa v. Waterworks Company, supra*, held that the prior special act imposed a specific mandatory

. . . continuing duty to revise rates to enable the water system to be financially selfsufficient while maintaining a rate structure which operates in an equitable manner. The rate contract in this case operates as a bar to this requisite flexibility . . . *Id.* at 204.

As a result, the county lacked the power to bind itself to a thirty year contractual rate, since such a contract would preclude the necessary exercise of discretion required by the Special Act in order to maintain the economic self-sufficiency of the water system. *Id.* at 203. Being ultra vires, the contract was void from its inception.

Recently, in *Southern Bell Utilities, Inc. v. City of North Miami Beach*, 323 So.2d 669 (3rd D.C.A.Fla.1975), the Third District Court of Appeal held that a contract of indefinite length between the city and a private utility company was void. In 1949, the Florida Legislature by special act empowered the city to set water rates periodically. In 1964, the city contracted to supply water indefinitely to the utility company at a fixed rate. By ordinance, the city in 1974 established new rates for such water supply, and the utility company sued to enforce the earlier contract. Citing *City of Tampa v. Tampa Waterworks Company, supra*, the Third District Court of Appeal held that at the time of execution the contract was subject to the antecedent special act. *Id.* at 671. Because the contract appeared to bind the city ad infinitum, thus purporting to preclude the city for exercising its obligatory statutory duty to revise rates, it was void from its execution. *Id.* at 670.

■ Second, any contract by a city and a utility company that imposes unalterable and interminable rates over a long term or an indefinite period of time will be superseded by the pre-emptive, inherent police power of the Florida Legislature if it later exercises that authority. *City of Plantation v. Utilities Operating Co.*, 156 So.2d 842 (Fla.1963) is the seminal case for this line of law. The city and a utility company entered into a thirty year contract for utility services to the city at "reasonable rates" with the city retaining final authority to determine what that term meant in varying situations. Five years later, however, the Legislature enacted a statute that vested regulatory authority over the utility services in a governmental agency. The city sought declaratory relief concerning the validity of its contract. On appeal from a decree adverse to the city, the Supreme Court of Florida held that the subsequent enactment by the Legislature was an exercise of the State's continuing police power that pre-empted the pre-existing contractual authority of the city. *Id.* at 843. The city could not "foreclose the exercise of the State's police power" over the life of such a contract. *Id.* Furthermore, every contract such as that

. . . is presumed to have been made with full knowledge of the inherent reserved power of the State to alter the contract regarding rates at such time as the Legislature deems it appropriate to assert the power under the Constitution. It also follows that when the parties enter into such a contract they do so with the full realization that the contractual provisions are ineffective to preclude subsequent legislative action in the exercise of the State's police power. *Id.* at 843–44.

To the extent that the city's contract conflicted with it, the contract was abrogated and voided by the Legislature's legitimate exercise of the State's police power.

In *Merritt Island Sanitation, Inc. v. E. L. Green*, 251 So.2d 132 (4th D.C.A.Fla.1971), the question was whether a private utility company retained its authority to set utility rates under a contract of indefinite dura-

tion, in the face of subsequent legislation that appeared to vest exclusive regulatory authority in the Board of County Commissioners. The Fourth District Court of Appeal, citing *City of Plantation v. Utilities Operating Co., supra*, held that a private contract that purported to retain regulatory control over the utilities services "must necessarily yield to legislative action" vesting that control in "a governmental agency or body." *Id.* at 133. As a result, the contract was automatically terminated upon the effective date of the later legislation. *Id.* at 133, 134. Finally, a month later, in *Hampton Utilities Co. v. Hampton Homeowners Ass'n*, 252 So.2d 286 (4th D.C.A.Fla.1971), the same Court of Appeal held that a trust deed agreement by a private utility company providing for rate schedules and rate changes was voided by later legislative enactments. The trust deed agreement was executed in 1957. In 1967 the Florida Legislature enacted a statute authorizing the Board of County Commissioners to regulate private utilities. In 1970, the Legislature vested in the Public Service Commission regulatory jurisdiction over utility systems. Citing *City of Plantation v. Utilities Operating Co., supra*, the District Court of Appeal held that the two later statutes superseded and abrogated the trust deed agreement, and the most recent statute repealed the earlier one. *Id.* at 287. Additionally, the trust deed agreement had been executed fully cognizant of, and subject to, the pre-emptive State police power inherent in the Legislature. *Id.* at 287–88.

■ Third, if a contract between a city and a utility provides a formula for annual (or other reasonable, periodic) revision of rates, and is reasonably terminable as well, it will be flexible enough to facilitate any exercise of State police power whether delegated or not that is necessary to preserve the fiscal solvency of the city; and it will therefore remain enforceably valid. *City of Safety Harbor v. Pinellas County*, 218 So.2d 528 (2d D.C.A.Fla.1969) was a case where the county sued for money owed it under a contract to provide utility service to the city. The trial court held that the contract

was ultra vires void from its execution because of a pre-existing statutory authority for the county to regulate its utilities. Nonetheless, the trial court granted judgment on the pleadings for the county, holding that the city was obligated to pay for utility service at the rates set by the county under its earlier statutory authority. On appeal, the Second District Court of Appeal reversed, holding that the contract "on its face" was "not ultra vires", but that questions of fact remained to be answered which would prevent entry of judgment without an evidentiary hearing. *Id.* at 535. In examining the contract, however, the court noted striking distinctions from the contract that was void from the outset in *City of Clearwater v. Bonsey, supra. Id.* at 533. Unlike the contract in *City of Clearwater v. Bonsey*, that set utility rates unalterably for thirty years, there was a formula for annual rate revision. Moreover, the contract was flexible enough to keep pace with the actual cost to the county of supplying utility service. *Id.* at 533, 535.

In *City of Daytona Beach v. Stansfield*, 247 So.2d 753 (1st D.C.A.Fla.1971), the District Court of Appeal affirmed an order of the trial court, enjoining the city from charging by ordinance utility rates in excess of those under a contract to which it had agreed. On certiorari review, *City of Daytona Beach v. Stansfield*, 258 So.2d 809 (Fla. 1972), the Supreme Court of Florida held that the contract was enforceable and the city was bound by it. *Id.* at 811. The court declared that the contract was similar to the one upheld in *City of Safety Harbor v. Pinellas County, supra*, because it was sufficiently flexible in its rate-adjustment formula to prevent the city from operating at a long-term loss. *Id.* at 810. Hence, the contract was distinctly unlike the inflexible, thirty-year contract in *City of Clearwater v. Bonsey, supra*, that was ultra vires from its inception. *Id.* Finally, the court noted that the contract was a beneficial venture for the city at the time that it was executed. *Id.*

Recently, the Second District Court of Appeal clarified the distinction between enforceable contracts and voidable or void ab initio contracts for utility service. In *Pinellas County v. City of Pinellas Park*, 330 So.2d 106 (2d D.C.A.Fla.1976) there were two different contracts, by two different cities, for utility services provided by the county. The contract between the county and the City of Pinellas Park contained a formula for an annual revision of rates to correspond to the actual cost to the county for supplying utility service. The contract between the county and the City of Largo had no such provision. The county unilaterally raised its rates charged to both cities, contending that it had an incumbent duty, and inherent power, to raise rates at any time, in order to preserve its self-liquidating solvency. *Id.* at 107. Further, the county argued that the contracts were an attempt to limit inflexibly the county's exercise of its power to meet its fiscal duty. *Id.* at 108.

The court held that the contract containing the formula for annual rate revision not only was not an unreasonable restriction on the county's power and duty, but rather it affirmatively promoted "the performance of that duty by providing a known schedule periodically" to revise the rates. Hence, the contract was "a valid, reasonable and enforceable one." *Id.* Cf. *Belcher's Sugar Refining Co. v. St. Louis Grain Elevator Co.*, 101 Mo. 192, 13 S.W. 822, 825, 827 (1890). The contract without a provision for reasonable rate adjustments, however, was ultra vires void in the face of the pre-existing, delegated authority and duty of the county to regulate utility rates. *Id.* While there were mutually advantageous reasons that prompted the execution of the two contracts, there was no justification for attributing to the contract without the rate-adjustment formula the preserving benefits of the other contract's rate-revision provision. *Id.*

█ It is clear that JEA seeks the Court to apply the first or second principles to the contract in this case, holding it unenforceable. It is equally clear to the Court, however, that the contract in this case exemplifies those held valid and enforceable under

the third principle. The contract between JEA and Anchor Hocking was reasonable and flexible. It was readily terminable unilaterally upon ninety-days' notice. It contained a monthly-progressing, rate-adjustment formula to correspond to increasing average costs. The contract did not restrict or freeze the authority of JEA (as derived from the City of Jacksonville) to adjust rates in order to meet its duty of financial solvency. Rather, like the contract in *Pinellas County v. City of Pinellas Park, supra* at 108, the progressing, twelve-month-average, rate-adjustment formula facilitated the performance of that duty through a constant revision of rates. Moreover, the facts of the case indicate that, under the contractual formula, JEA would have been recovering an excess over its cost basis two months before the contract was terminated. Deposition of Ronald O. Snyder at 30–31. Additionally, like the contracts in *City of Daytona Beach v. Stansfield, supra* at 810, and *Pinellas County v. City of Pinellas Park, supra* at 108, this contract was desirable to both JEA and Anchor Hocking at the time it was executed.

For an interim period during the life of the contract, its obligations became less desirable to JEA. Nonetheless, JEA had two choices readily available under the provisions of the contract: (1) JEA could have exercised its right to terminate the contract unilaterally upon ninety-days' notice; or (2) it could have continued to adhere to the terms of the contract, with a possible recovery under the contractual formula of its initial losses. If under those circumstances, however, JEA could simply ignore the provisions of the contract, impose new rates on its own, and proclaim the contract void, then the worth of any contract with JEA would be limited to the value of the paper on which it is written. The law of Florida will not countenance such conduct. The Court holds that the contract between JEA and Anchor Hocking was a reasonable and flexible one, and that it remained enforceable against both parties until terminated. The Court therefore further holds that JEA's first affirmative defense that the contract was void ultra vires or voided by

pre-emptive, superseding law, is legally nonexistent.

JEA's second affirmative defense is that the increased electricity rates that it began charging in November, 1973, were authorized under the provisions of the contract. Specifically, JEA contends that the increased rates correspond to its increased fuel costs which, in turn, are attributable to corresponding taxes imposed by the government of Venezuela. In short, JEA argues that, to the extent that its increased rates exceed those allowable under the contractual formula, they represent taxes against JEA that may be directly passed on to Anchor Hocking under § 3 of the contract. In opposition, Anchor Hocking argues that JEA's suddenly increased rates do not represent taxes imposed against JEA, and directly recoverable under § 3 of the contract; instead, they represent increases in the purchase price of, and thus JEA's cost basis for, fuel oil for its generators.

The question presented by the motion to dismiss JEA's second affirmative defense, then, is also purely one of law. It is a question of interpreting § 3 of the contract under Florida law as it relates to increased rates and the putative taxes that they allegedly represent. The specific question presented is whether the increased tariffs which the government of Venezuela imposed on the oil that it exports are taxes against JEA that may be passed on, and recovered, immediately by increased electricity rates under § 3 of the contract.

 To begin with, under Florida law there are two kinds of taxes: direct and indirect. *City of Deland v. Florida Public Service Comm'n,* 119 Fla. 804, 161 So. 735, 738 (1935). Direct taxes are ad valorem taxes: taxes based on the assessed value of the property subject to taxation. Fla.Stat. § 192.001. Indirect taxes are excise or occupational taxes: taxes imposed upon the manufacture, sale, or consumption of commodities within the state; upon the licensed right or privilege to pursue certain occupations; and upon corporate franchises and privileges. *City of Deland v. Florida Public*

*Service Comm'n, supra* at 738; *Hi-Octane Terminal Co. v. Panama City,* 164 So.2d 39, 40–41 (1st D.C.A.Fla.1964). There is no question that the production of electrical utility service is a proper item for indirect taxation in the form of an excise tax. *City of Deland v. Florida Public Service Commission, supra* at 738.

It is therefore clear to the Court that the same two kinds of taxes under Florida law were anticipated by § 3 of the contract. Section 3 provided for the adjustment of rates to reflect any allocable "ad valorem taxes which may hereafter be 'assessed against and payable by the utility on the properties of its electric system". Unmistakeably, that clause anticipates direct, ad valorem taxes on the assessed values of JEA's property. Similarly, § 3 of the contract allows adjustment of rates to reflect

> . . . any other taxes or assessments imposed by any government authority . . . whether levied on the basis of meters or customers or the price of or revenue or income from electric energy or service sold or the volume of energy generated or purchased for sale or sold . .

Although JEA argues that this clause anticipates the increased Venezuelan export tariffs, the language of the clause is that of indirect excise taxation under Florida law. Compare the language of *City of Deland v. Florida Public Service Comm'n, supra* at 738.

■ The increased tariffs on oil exported from Venezuela resulted from an increased income tax, under Article 41 of the Venezuelan Income Tax Law, upon a taxpayer-exporter who exports petroleum crude oil and petroleum derivatives. Affidavit of Charles D. Evans at 1–2, 4. Because the exporter is taxed by Venezuela according to a fixed income level, the only way he can recover the increased tax that he must pay the Venezuelan government is to be sure that his prices for petroleum at least keep pace with the new, increased tax on him. Hence, the price of petroleum crude oil has increased. The American importer paying an increased purchase price to the exporter,

in turn, increased his prices to utility companies, like JEA; and they, in turn, incurred increased cost bases for their fuel which they could receive only from increased rates, subsidies, or some other source.

It is clear to the Court, nonetheless, that the Venezuelan tax does not qualify as a tax anticipated, and allowed for, under § 3 of the contract. The tax is not one of the two kinds of taxes recognized under Florida law, and thus it could not have been anticipated that such a tax might be imposed on JEA. Furthermore, the tax was not imposed against JEA. It is at least two middle-men removed from JEA. Having been imposed on the income of the Venezuelan exporter its effect upon the export-import-retail chain is increased prices. The impact on JEA occurs eventually through higher cost bases-debts-incurred by JEA in its obligation to pay the purchase prices under various supply contracts.

■ The burdens of the two kinds of taxation under Florida law do not arise from contractual obligations. Neither are they "debts" in the ordinary commercial meaning of that term. *Kathleen Citrus Land Co. v. City of Lakeland,* 124 Fla. 659, 169 So. 356, 358 (1936); *St. Lucie Estates v. Ashley,* 105 Fla. 534, 141 So. 738, 739 (1932). Instead, the two kinds of taxes under Florida law are enforced contributions from persons and property, imposed by the sovereign, to achieve some public purpose. *Smith v. Lummus,* 149 Fla. 660, 6 So.2d 625, 627 (1942); *Blake v. City of Tampa,* 115 Fla. 348, 156 So. 97 (1934); *Burnett v. Greene,* 97 Fla. 1007, 122 So. 570, 577 (1929); *Atlantic Coast Line R.R. Co. v. Lakeland,* 94 Fla. 347, 115 So. 669, 676 (1928); *Getzen v. Sumter County,* 89 Fla. 45, 103 So. 104, 106 (1925). The Court thus holds that the increased costs of fuel incurred by JEA, resulting from increased Venezuelan income taxes on petroleum exporters, do not. represent taxes contemplated under § 3 of the contract; and consequently JEA's sharp departure from the contractual rate-adjustment formula was not justified under § 3 of

the contract. This defense, too, stands on nonexistent legs.

In considering these motions to strike, under Fed.R.Civ.P. 12(f), the facts have been assumed to be as set forth in JEA's answer, *Kelly v. Kosuga*, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959), except for the recurrent phrase that recited the same legal conclusion raised by JEA's first affirmative defense: "the contract was abrogated by operation of law." While the Court has broad discretion in disposing of motions to strike, *Coca-Cola Co. v. Howard Johnson Co.*, 386 F.Supp. 330, 333 (N.D. Ga.1974), they are granted only where clearly warranted. *Giraud v. Teamsters, Chauffeurs, Warehousemen, and Helpers, Local 901*, 46 F.R.D. 5 (D.P.R.1969). The standard that must be met is undisputed: only if a defense is insufficient as a matter of law will it be stricken. *Systems Corp. v. A T & T Co.*, 60 F.R.D. 692, 694 (S.D.N.Y. 1973); *Carter-Wallace, Inc. v. Riverton Labs, Inc.*, 47 F.R.D. 366, 367–68 (S.D.N.Y. 1969). A defense is insufficient as a matter of law if, on the face of the pleadings, it is patently frivolous, *Shenandoah Life Ins. Co. v. Hawes*, 37 F.R.D. 526, 529 (E.D.N.C. 1965); or if it is clearly invalid as a matter of law. *United States v. 416.18 Acres of Land*, 514 F.2d 627, 630–31 (7th Cir. 1975); *United States v. 187.40 Acres of Land*, 381 F.Supp. 54, 56 (M.D.Pa.1974); in such cases, the determination should be made, and the defenses stricken, in order to avoid unnecessary time and money in litigating invalid, spurious issues. *United States v. 416.18 Acres of Land*, 514 F.2d 627, 637 (7th Cir. 1975); *Purex Corp. v. General Foods Corp.*, 318 F.Supp. 322, 323 (C.D.Calif.1970). On that standard, the reasoning set forth above demands that the motions be granted and JEA's first and second affirmative defenses be stricken; and it is. so ordered.