MIAMI LAUNDRY COMPANY, a Florida Corporation, *et al.,*
v. FLORIDA DRY CLEANING AND LAUNDRY BOARD, an
official Board of the State of Florida, *et al.*

183 So. 759.
En Banc.
Opinion Filed July 27, 1938.
Rehearing Denied September 20, 1938.

2

4

*Curry & Vann, L. Earl Curry* and *Evan T. Evans,* for Appellants;

*Walsh, Beckham & Ellis, Marks, Marks, Holt, Gray & Yates, W. McL. Christie, Hampton, Jordan & Lazonby,. Cary D. Landis,* Attorney General, and *Lawrence A. Truett,* Assistant Attorney General, for Appellees.

*Maxwell & Cobbey* and *Hampton, Bull & Crom* and *Whitfield & Whitfield,* as *Amici Curiae.*

TERRELL, J.—The Legislature of 1937 enacted Chapter 17894, Laws of Florida, designed to regulate the cleaning, dyeing, pressing, and laundry industries. In November, 1937, Miami Laundry Company, as complainant, filed its bill of complaint in the Circuit Court of Duval County challenging the constitutional validity of said Act, charging that it was arbitrary, unwarranted, unnecessary and unreasonable.

The Florida Dry Cleaning and Laundry Board having been named as defendant filed its answer in which it denied the material allegations of the bill of complaint and asserted the constitutionality of said Act. Numerous parties were permitted to intervene both as complainants and defendants. By stipulation, the cause was submitted to the Chancellor on the pleadings and affidavits who in due course entered his final decree upholding the validity of the Act against all attacks made and dismissed the bill of complaint. This appeal is from the final decree.

Six questions are posed for our determination but they all turn on the constitutionality *vel non* of Chapter 17894, Acts of 1937.

The first legislation on the subject matter of the Act in this State was Chapter 16979, Acts of 1935, some phases

of which were considered in the following cases: Economy Cash and Carry Cleaners, v. Cleaning, Dyeing, and Pressing Board, 128 Fla. 408, 174 So. 829, Coleman, Sheriff, v. State, *ex rel.* Lichtenstein, 128 Fla. 408, 174 So. 829; Bon Ton Cleaners and Dyers, Inc., v. Cleaning, Dyeing, and Pressing Board, 128 Fla. 535, 176 So. 55.

The Act under review is different from the 1935 Act considered in the foregoing cases in that it contains a legislative finding of evils that have become prevalent in the industries attempted to be regulated and the need for the regulation complained of. It also provides for the appointment by the Governor of the Florida Dry Cleaning and Laundry Board composed of seven members, defines their duties, authorizes them to fix a schedule of prices to be charged for services in the industries affected but requires them prior to the fixing of such charges to advertise and hold public hearings to advise themselves of what factors should determine reasonable charges to be made so as to meet the requirements of due process, Section 6, on this point being as follows:

"In considering prices the Board shall take into consideration the rights of the general public, the reasonable and necessary expense and overhead of the industry herein regulated, in rendering efficient and sanitary service, with modern equipment and efficient operation, together with the allowing for such reasonable overhead expense including reasonable compensation for labor and the fixing of such reasonable charges as will permit the business herein regulated to be conducted so as to provide the public with safe and sanitary service at a reasonable price while enabling the efficient proprietor of such business to continue in business with a fair return on the actual reasonable investment made therein. Different prices may be reasonably fixed for dif-

ferent trade areas as the same may be established by the Board."

The Act carries ample provision for appeal from the orders of the Board, provides for prompt payment and adjustment of claims by those engaged in the dry cleaning and laundry business and makes certified copies of the orders of the Board admissible as *prima facie* evidence of their reasonableness. Its provisions are made applicable to counties of more than 17,500 population.

The major assault of the Act is directed to that part of Section 6 here quoted relating to price fixing in the industries affected, it being contended that such provisions unduly restrict the liberty of contract granted to citizens of Florida by the State and Federal Constitutions.

To support the charge of invalidity, Appellants rely on Adkins v. Childrens Hospital, 261 U. S. 525, 43 Sup. Ct. 394, 67 L. Ed. 785; State, *ex rel.* Fulton, v. Ives, 123 Fla. 401, 167 So. 394; Economy Cash and Carry Cleaners, Inc., v. Cleaning, Dyeing and Pressing Board, 128 Fla. 408, 174 So. 829; Kent Stores v. Wilentz, 14 Fed. Supp. 1; Becker v. State, 37 Del. 454, 185 Atl. 92, and City of Mobile v. Rouse, 233 Ala. 622, 173 So. 266, 111 A. L. R. 349.

These cases have been examined and it would be folly to assert that they do not aid Appellant's contention; at the same time, some of them deal with situations materially different from what we have here, and as to others, the doctrine announced in them has been specifically or inferentially overruled. We pretermit a discussion of the philosophy back of these cases.

Liberty of contract and the right to use one's property as he wills are fundamental constitutional guaranties, but the degree of such guaranties must be determined in the light of social and economic conditions that prevail at the time the guaranty is proposed to be exercised rather than

at the time the Constitution was approved securing it; otherwise the power of the Legislature becomes static and helpless to regulate and extend them to new conditions that constantly arise.

Constitutional guaranties have never been thought to be immune from regulation or limitation in the interest of the common good. When limited, the process has been evolutionary rather than spontaneous. Regulation might be appropriately denied today that could be just as appropriately granted tomorrow. When the exercise of a constitutional guaranty is limited to such a small sector of the population that the rights of the public will be protected by unrestricted competition, the Legislature will not generally attempt to regulate, but when large numbers become involved, many of whom are unequal in the race, and their economic security becomes imperiled through the exercise of what may appear to be the constitutional right of another, then the Legislature has not hesitated to step in and regulate.

The factors determining the regulation of a trade, business, or profession are for legislative determination, but they have generally been actuated by public necessity. If done in the exercise of the police power, the health, morals, and welfare must be involved. It has also been said that the business regulated must be affected by or clothed with a public interest, but regardless of the basis on which done, if public necessity requires it would be contrary to every concept of social justice to hold that the Legislature could not grant relief. One may "Robinson Crusoe like" isolate himself and thereby enjoy the complete unrestrained exercise of his constitutional guaranties, but the moment he becomes a unit in organized society, he surrenders a measure of his freedom and the more thickly that society becomes populated and the more complex its means of making

a living become, the more freedom he must make up his mind to surrender.

There is no magic in the phrase, "clothed with or affected with a public interest. "Any business is affected by a public interest when it reaches such proportions that the interest of the public demands that it be reasonably regulated to conserve the rights of the public and when this point is reached, the liberty of contract must necessarily be restricted. If the regulation involves the question of price limitation, it will be upheld unless clearly shown to be arbitrary, discriminating, or beyond the power of the Legislature to enforce. Nebbia v. New York, 291 U. S. 502, 54 Sup. Ct. 505, 78 L. Ed. 940; Bordens Farm Products Co., Inc., v. Ten Eyck, 297 U. S. 251, 56 Sup. Ct. 453, 80 L. Ed. 669; West Coast Hotel Co. v. Parrish, 300 U. S. 379, 57 Sup. Ct. 578, 81 L. Ed. 703; Highlands Farms Dairy v. Agnew, 300 U. S. 608, 57 Sup. Ct. 549, 81 L. Ed. 835; Miami Home Milk Producers Association v. Milk Control Board, 124 Fla. 797, 169 So. 541. See also inferences from Economy Cash and Carry Cleaners, Inc., v. Cleaning, Dyeing and Pressing Board, *supra;* Coleman, Sheriff, v. Lichtenstein, *supra;* and Bon Ton Cleaners and Dyers, Inc., v. Cleaning, Dyeing and Pressing Board, *supra.*

These cases involve some element of the question of price fixing and support the rule that when the conditions in a business become such that the welfare of the public will not be adequately protected by unrestricted competition, or if it be shown that ruinous and chaotic conditions are otherwise about to be brought about in the business, that the economic existence of large numbers of people is being threatened, then the law may step in and prescribe regulations to correct the alleged or threatened abuses.

The Act drawn in question contains ample provision for a fact finding inquisition to determine whether or not the dry cleaning and laundry businesses are such as are subject to appropriate regulation by it and whether or not conditions therein are such as demand the regulation complained of. It also contains ample provision to protect the public in making such regulations as may be deemed proper and necessary.

The fact that such regulations are promulgated by an authorized board, even though they include provision for price fixing, if done after hearing and notice, will not render them violative of due process and the equal protection clause of the Fourteenth Amendment. Gin Company v. State of Oklahoma, 252 U. S. 339, 40 Sup. Ct. 341, 64 L. Ed. 600; Tagg Brothers & Morehead v. U. S., 280 U. S. 420, 50 Sup. Ct. 220, 74 L. Ed. 524. From these and other cases cited, it may be safely stated that the test of this power to fix prices by the Legislature is not always on the theory that the business regulated must be affected with a public interest but a showing on good authority that the business should be regulated in the interest of the public may also be used as a basis for price fixing.

It is timely to state in this connection that the regulations promulgated by an administrative board including that of price fixing must in' the interest of the public be done in strict compliance with the requirements of the law with reference to notice and hearing. Otherwise they will not be in compliance with due process. Morgan v. United States of America, decided by the Supreme Court April 25, 1938. Such regulations cannot be justified solely in the interest of the business regulated but the public has vital interest in them, which if not observed will render them invalid. The procedure followed in this case to accomplish the result complained of is not challenged. Appel-

lants are content to rest their case on the asserted invalidity of the Act.

The laundry and dry cleaning business has frequently been held subject to regulation under the police power of the State. Newman v. Atlanta Laundries, 174 Ga. 99, 162 S. E. 497; 286 U. S. 525, 52 Sup. Ct. 495, 76 L. Ed. 1269; *Ex Parte* Boyce, 27 Nev. 299, 75 Pac. 1; *In re* Wong Wing, 167 Cal. 109, 138 Pac. 695; United States v. Spotless Dollar Cleaners, 6 Fed. Supp. 725; Oklahoma Operating Company v. Love, 252 U. S. 331, 40 Sup. Ct. 338, 64 L. Ed. 596.

Courts are not authorized to adjudicate questions of public policy involved in such regulations or to conduct an inquiry into questions of fact pertaining to matters of policy, but where the Legislature has made such an investigation and determination, unless shown to be clearly arbitrary, erroneous, or unwarranted, the courts will approve them. American Jurisprudence, Vol. II, page 823.

The Legislature is accordingly the judge of when the facts are such that a given business should be regulated under the police power or when it is affected with a public interest to such an extent as to require regulation. If the regulation enforced has some reasonable relations to the legislative purpose and is not arbitrary or discriminatory, the requirements of due process are satisfied. In its last analysis, government, regardless of the form it takes, is nothing more than an instrument to preserve an ordered society. Laws are nothing more than rules promulgated by government as a means to an ordered society. It would be a strange anomaly to hold that the complexities in society had become such that the Legislature was powerless to grant appropriate relief against abuses arising therefrom.

The law is settled that a legislative declaration to the effect that a business is impressed with a public interest or demands regulation under the police power or in the public interest is not conclusive, but is subject to judicial review. Becker v. State, *supra*. It is not essential to discuss these concepts here as each case must stand or fall on its peculiar factual background. In no case should either concept be used as an instrument of abuse or to write into the law group concepts of social justice in total disregard of the rights of the public. The ultimate question in all such cases is how best to protect the public and at the same time give all plying the same trade or business the greatest amount of liberty.

The fact that the Act assaulted is limited in its application to counties of more than 17,500 population goes to the question of classification and is not deemed to be arbitrary or unreasonable. Liggett v. Amos, 104 Fla. 609, 141 So. 153; Liggett v. Lee, 109 Fla. 477, 149 So. 8; State, *et al.,* v. Minge, *et al.,* 119 Fla. 515, 160 So. 670.

In requiring the three members of the Board should be chosen from the cleaning industry, three members from the laundry industry and one member to represent the public, we do not understand the Act to do more than require that three members of the board must have had experience in the laundry business and three members must have had experience in the cleaning business. In other words, all the Act does is to prescribe certain qualifications for those appointed to it. We do not construe such requirements to unduly restrict the appointive power. State, *ex rel.* Landis, v. Ward, 117 Fla. 585, 158 So. 273; State, *ex rel.* Buford, v. Daniel, 87 Fla. 270, 99 So. 804.

The decree appealed from is accordingly affirmed.

Affirmed.

WHITFIELD, BUFORD and CHAPMAN, J. J., concur.

ELLIS, C. J., and BROWN, J., dissent.

WHITFIELD, J. (concurring).—The organic provision that "all men are equal before the law, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing happiness and obtaining safety," is primarily and essentially applicable to natural persons. See Section 12, Declaration of Rights. The exercise of such "inalienable" rights is subject to due and reasonable governmental regulation to conserve the general welfare and the rights of others under the law. If somewhat similar rights are by statute conferred upon corporations, such rights are subject to regulation under the sovereign power of the State. If rights are inherently possessed or are conferred under State authority, and such rights have relation to "performing * * * services of a public nature," they are subject to governmental regulation not only under the sovereign police or other power of the State, but under an express provision of the Constitution "that the Legislature is vested with full power to pass laws for the correction of abuses and to prevent unjust discrimination and excessive charges by persons and corporations * * * performing * * * services of a public nature." Section 30, Article XVI.

What are "services of a public nature" and the conditions and limitations under which they may be performed and the charges therefor, may be determined and regulated as may be provided by statute; and the courts do not interfere unless it is duly shown that in the enactment or in the application or enforcement of the statute, organic rights of parties entitled to complain have been or will be violated or unduly invaded, because of the invalidity of the statute or the arbitrary nature of the action taken under the statute

or otherwise. All rules and regulations and charges fixed by administrative boards under a statute *must be just and reasonable,* as may be determined ultimately by the courts.

Where rights involving the liberty of contract in "performing services of a public nature," are duly conferred upon a corporation, the State has the power (whether it is expressly reserved when the right is conferred or not) under the Constitution to by law regulate the exercise of the rights conferred to correct abuses and to prevent unjust discrimination and excessive charges, and under the police or other sovereign power to require sanitary and efficient service without disorder or disregard of the public needs.

Under Section 30, Article XVI, of the Constitution, and under the vested general law-making power of the Legislature, Section 1, Article III, unless restrained by other organic law, statutes may make appropriate regulations of the performance of services of a public nature including "the Dry Cleaning and Laundry Business" and "the Cleaning, Dyeing, Pressing and Laundry Industry" as operated in this State, affecting the health and general public welfare; and duly enacted and valid statute may require all those operating under like or similar conditions generally, or in proper classifications of municipalities, to observe the same rate of charges when the regulations are authorized by a valid statute and are not arbitrary and oppressive and the charges for the services are not excessive or unjustly discriminating, but are reasonable and just for the services performed. Such regulations do not necessarily deprive anyone of liberty or property without due process of law. Particular cases might; but it must be duly shown.

In this case the statutory regulations for fixing charges for service are not shown to violate organic law; and the charges fixed by administrative officers under the statute

*are not shown to be* an abuse or unjustly discriminating or excessive. The statute contemplates that rules and regulations and rates adopted by the administrative board shall be reasonable and just; and arbitrary action by the board is impliedly forbidden by the statute.

BUFORD and CHAPMAN, J. J., concur.

ELLIS, C. J., and BROWN, J., dissent.

BROWN, J. (dissenting):—This is easily one of the most important cases that has ever been brought to this Court for decision.

Cases involving the field within which the police powers of the State may be appropriately exercised without unduly encroaching upon those fundamental personal and property rights which are guaranteed and protected by our State and National Constitutions nearly always present delicate and difficult questions for the judicial branch of the government to decide, but questions which, under our form of government, they *must* decide, else constitutional guarantees would become "mere scraps of paper."

We are here dealing with the constitutionality of an Act which authorizes an administrative board to control and regulate the laundry, dyeing, and dry-cleaning businesses of this State, in all their ramifications, including the prices to be charged by such businesses, in all the counties of this State having a population in excess of 17,500. In other words, we are dealing with an Act by which the State, acting through an administrative board, assumes to exercise the power to regulate and fix the prices to be charged in an ordinary business, not a public utility, nor a paramount or basic industry, nor one directly or materially affecting the public health, such for instance as the dairy industry. Surely the washing and dyeing and cleaning of clothes and linens has no greater relation to the public health than the

making or selling of clothes and linens, and not nearly so vital a relation to the public health as the making and selling of the foods we consume and the medicines we take. Thus if the State, acting through an administrative board, can under our Constitution fix the prices to be charged by those engaged in the laundry and dry cleaning business, it likewise has the power to fix and regulate the prices to be charged by clothing stores, tailoring establishments, drug stores, grocery stores, "the butchers and bakers and candlestick makers," and a host of other businesses. Whether or not this State control of business generally would constitute a wise public policy is not for this Court to say, but whether it can be done under our present Constitution, it is both the province and imperative duty of this Court to decide.

If we hold, as I think we must, that this cannot be done under our present Constitution, then, if the people of Florida desire to inaugurate this policy of State regulation and control of business and of prices, in regard to all businesses and industries, or with respect only to the particular class of businesses involved in this Act, they can readily do so by the adoption of a constitutional amendment. But this Court has no power (nor do any of its members intend) to amend the Constitution by judicial decree; nor should it, in my opinion, do so, in effect, by a change in its former construction of the meaning of a constitutional provision unless thoroughly convinced that such former construction was erroneous.

It is, and long has been, generally understood by the people of Florida that under our Constitution the Legislature has the power, which it has exercised for many years, either directly, or, by proper enactment, through administrative officers or boards, to regulate and fix the prices or rates charged by public utilities, such as common carriers—

railroads, bus and truck lines, etc.—electric light, power and water plants, telegraph and telephone companies, but it no doubt would have come as a surprise to most of our people, and to the bench and bar of the State, when in 1936 this Court upheld the constitutionality of the Act regulating through a State Board the price of milk, for a two-year period, had it not been that this had already been done in New York State and the constitutionality of the New York Act upheld by the courts of New York and by the United States Supreme Court, in the Nebbia case, for reasons which do not apply to businesses and industries in general.

I thoroughly agree that, in the application of constitutional provisions to new and changed factual conditions, there is such a thing as the new application of old principles without changing the principles. In the opinion of this Court on rehearing in the case of Carlton v. Mathews, 103 Fla. 301, 381-382, 137 So. 815-848, written by the writer of this opinion, it was said:

"Constitutional principles do not change, except as they may be altered by the people through constitutional conventions or by amendments made in the manner prescribed by the Constitution. The Constitution does not mean one thing yesterday or today and another tomorrow. But while constitutional principles do not change, sometimes conditions do change and new and different conditions arise and new statutes are enacted to deal with them, and constitutional principles must be applied to meet such new statutes and conditions as they arise, fairly, intelligently, and impartially. The principles of the Constitution must be preserved at all hazards, in all their pristine vigor and purity, and the language in which they are expressed given its plain and obvious meaning and true intent, uninfluenced by any spirit of expediency or opportunism. Euclid v. Ambler Realty Co., 272 U. S. 365, 47 S. Ct. 114, 71 L.

Ed. 303, 54 A. L. R. 1016. But in applying such principles to new or changed conditions, the courts should fearlessly face the facts—the actualities and realities of the situations and questions thus presented—and apply the principles of the Constitution to them without any sacrifice whatever of such principles, and without any strained construction of the language in which those principles are expressed."

I have not yet seen any reason for departing from these principles of constitutional construction.

Primacy of position in our State Constitution is accorded to the Declaration of Rights. It is significant that our Constitution begins by specifying those things which the State Government must not do before specifying certain things that it may do. These declarations of rights are the fruitage of years; they have their roots deep in human nature and in the past. They breathe the spirit of that sturdy and self-reliant philosophy of individual liberty which underlies and supports our American system of government, and has done so from its birth. Their establishment and enforcement have cost our forefathers much, both on the field of battle and in the efforts of their leaders and statesmen. "No race of hot-house plants could ever have produced and compelled the recognition of such a stalwart set of basic principles, and no such race can preserve them." State, *ex rel.* Davis, Attorney General, v. City of Stuart, 97 Fla. 69, 120 So. 335.

The first section of our Declaration of Rights provides that "All men are equal before the law, and have certain inalienable rights, among which are those of enjoying and preserving life and liberty, acquiring, possessing and protecting property and . pursuing happiness and obtaining safety." And Section 12 provides that "no person shall be * * * deprived of life, liberty or property without due process of law."

And the Fourteenth Amendment to the Federal Constitution provides that: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

While some of these principles hark back to Magna Charta, which was wrung by the Barons from the reluctant hands of King John some hundreds of years ago, the doctrine of individual liberty had its greatest growth during the latter part of the 18th and the first half of the 19th centuries, and was a natural reaction against the autocratic, oppressive and paternalistic regime which had grown up during the middle ages, and which had its culmination, so far as our forefathers in America were concerned, during the reign of George III as King of England. Under this paternalistic regime personal liberty was unduly restricted. The citizen was hardly free to think for himself, his goods were subject to arbitrary seizure, his house to arbitrary search, his person to imprisonment for debt; he suffered heavy taxation without representation in the Parliament that imposed the taxes. The few were booted and spurred to ride, the masses were bridled and ridden. So when the American colonists revolted, promulgated their immortal Declaration of Independence, established that independence after seven years of war and came to form our State and Federal Constitutions, they were careful to enunciate all the limitations upon the powers of government contained in Magna Charta and the Bill of Rights, which their English forefathers had fought for, and went further and enumerated therein a number of other things which government should not interfere with.

The idea that society is everything and the individual

nothing of any importance; that government of the State is an entity in and of itself; for which man was created and of which he is but a means to an end, whether moral or immoral, right or wrong, was not regarded as founded upon fundamental principles, and such a philosophy was entirely foreign to the minds of the makers of America. They believed, as stated in the Declaration of Independence, that men are "endowed by their Creator with certain inalienable rights," and that, to paraphrase, in the most reverent spirit, the words of the Master with reference to the Sabbath, government was made for man, and not man for government; and that a rightly founded government "derives its just powers from the consent of the governed." They believed that individuals form the essential units out of which both society and government are created, and that the true theory of government is that according to which the good of the State and its citizens consists in the well-being and free initiative of its competent members, restricted only by such just and reasonable laws as are essential to the common good and to the protection of each citizen in the enjoyment of "life, liberty and property," and "the pursuit of happiness." Thus they believed that good government and individual liberty, freed of all arbitrary and unreasonable restraints, go hand in hand; that they are not antagonistic, the one to the other, for in the social state, the protection of government is indispensable to the highest and best development of the individual citizen. As was well said by our former President, Woodrow Wilson, in his work on "The State":

"Society is an organic association of individuals for mutual aid. Mutual aid to what? To self-development. The hope of society lies in infinite individual variety, in the freest possible play of individual forces; only in that can be found that wealth of resource which constitutes civilization

with all its appliances for satisfying human wants and miti-
gating human suffering, with all of its incitements to
thought and spurs to action. * * *. The individual must
be assured the best means, the fullest opportunities, for com-
plete self-development, but the most indispensable conditions
for self-development government alone can supply."

While doubtless many of these early Americans, after
they had won their independence and liberty at so great a
price, believed that in individual liberty and free compe-
tition they had found the solvent of all social problems.
But they were too familiar with the common law of Eng-
land and the ordinances which they had themselves adopted
during the colonial period to confound liberty with license.
They knew that individual liberty did not mean the right to
do so absolutely as one pleased, regardless of the effect of
his conduct on the general public or on the liberties and
rights of other individuals. That has never been the
American idea. We gather from the history and public
addresses of those days that what they had in mind was the
attainment of that liberty under law which would protect
the citizen in the enjoyment of life, liberty and property,
and give to each citizen free and equal opportunity for self-
development and the making of an honest livelihood with-
out arbitrary or oppressive governmental interference.
And so it was that these forefathers of ours insisted upon
the addition to the Federal Constitution of 1787, by the
first ten amendments, of a "bill of rights," and had not this
insistence been agreed to in advance, that great instrument
would not have been ratified by the requisite number of
States. It had not been thought necessary, by the states-
men who framed that notable instrument, to embrace therein
a bill of rights, because the Constitution created a federal
government of limited and delegated powers, but the leaders
and the people of most of the States thought that the temp-

tation to exceed those powers might arise in the future; hence the insistence above referred to. The first ten amendments, embracing the bill of rights, were promptly submitted to and adopted by the States as soon as possible after the ratification of the Constitution as framed by the Convention. One of these, the fifth, provided that "No person * * * shall be deprived of life, liberty, or property, without due process of law"; and in later years this provision was made compulsory upon all the State governments by the terms of the Fourteenth Amendment to the Federal Constitution, although our own State, and most if not all of the other States already had similar provisions in their State Constitutions.

As a side light on the spirit of the earlier days of this Republic, it might not be amiss to recall that Thomas Jefferson closed his first inaugural address with these words:

"Still one thing more, fellow citizens, * * * a wise and frugal government, which shall restrain men from injuring one another, shall leave them otherwise free to regulate their own pursuits of industry and improvement, and shall not take from the mouth of labor the bread it has earned." And another time he said: "The legitimate powers of government extend to such acts only as are injurious to others."

I have referred to these familiar historical facts to emphasize how carefully from the beginning of our American form of government, this ideal of its founders, the individual liberty of the citizen, free from all arbitrary restraints, has been established, and preserved as one of the fundamental American constitutional principles. And in this connection we might well take to heart the words of John C. Calhoun, who once said:

"Of the few nations who have been so fortunate as to adopt a wise constitution, still fewer have had the wisdom

long to preserve one.   It is harder to preserve than to obtain liberty."

This principle of personal liberty is so deeply founded in the instincts of human nature that it is as much a living principle today as it was in the days of our forefathers. The complexities and interdependencies of our modern civilization and economic system have changed human nature little, if any; nor have they changed or paralyzed the principles embodied in the bill of rights.   There have of necessity, throughout the subsequent years, been many new applications of these old fundamental principles.   And this process must continue.   Social and economic conditions are never static.   Thus laws which might have constituted arbitrary restraints of liberty a generation ago are now taken as a matter of course, and as being as much necessary for the protection of the individual citizen as for the public at large, of which the individual forms an integral part; such, for instance, as our traffic regulations, since the advent of the motor vehicle; and our comparatively recent laws for the protection of the public health in the light of modern scientific discoveries.   But the fair and reasonable application of these well settled fundamental constitutional principles to new conditions as they arise give the courts no power to abandon or change the principles themselves. This power is reserved to the people.

Practically from the foundation of our constitutional system, the individual liberty guaranteed thereby has been considered by the courts and the people, and generally by the legislative bodies, to embrace the right freely to make contracts, but this right of "freedom of contract" has never been deemed absolute or unlimited.

In So. Utilities Co. v. City of Palatka, 86 Fla. 583, 99 So. 236, this Court, speaking through Mr. Justice WHIT-FIELD, held that freedom of contract is not absolute; that

"Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community."

In the case of Riley v. Sweat, 110 Fla. 362, 149 So. 48, dealing with an Act imposing certain regulations upon dealers in corporate securities, one section of which Act was held unconstitutional, this Court, speaking through the late Mr. Justice Davis, then Chief Justice of this Court, said:

" 'Liberty' as that word is used in the Fourteenth Amendment of the Constitution of the United States, means more than mere freedom from servitude. 'Liberty' as protected by the Fourteenth Amendment to the United States Constitution means not alone the right of the citizen to be free from unauthorized physical restraint of his person. It means that he must be free in the enjoyment of all of his faculties; to be unhindered in the use of them in all lawful ways; to live and work where he will; to earn livelihood by any lawful calling; to freely pursue any livelihood or avocation, and for that purpose to enter into all contracts which may be proper, necessary and essential to his carrying out to a successful conclusion the purposes above mentioned, subject only to those valid restraints on individual action which may be exacted under the police power of the State. Smith v. State of Texas, 233 U. S. 630, 34 Sup. Ct. Rep. 681, 58 L. Ed. 1129; Williams v. Fears, 179 U. S. 270, 21 Sup. Ct. Rep. 128, 45 L. Ed. 186; Allegyer v. State of Louisiana, 165 U. S. 578, 17 Sup. Ct. Rep. 427, 41 L. Ed. 832.

"But the power of the State in providing for the general welfare of its inhabitants, authorizes its legislative power to be exercised in making and enforcing regulations which in its judgment are necessary and appropriate to secure the people against the consequences alike of ignorance and in-

capacity, as well as deception and fraud, in the pursuit of an otherwise admittedly proper and lawful calling, business or profession. Dent v. State of West Virginia, 129 U. S 114, 9 Sup. Ct. Rep. 231, 32 L. Ed. 623. Yet it is well settled that under the Fourteenth Amendment to the Constitution of the United States the guaranty of 'liberty' therein set forth precludes the direct, or indirect, forbidding by the State of the citizen's inherent right to engage in a useful and legitimate business, even though such business itself be subject to reasonable statutory regulations of an appropriate nature enacted under the police power. Adams v. Tanner, 244 U. S. 590, 37 Sup. Ct. Rep. 662, 61 L. Ed. 1336."

See also the recent case of Prior v. White, 180 Fla. 347, 180 So. 347.

In addition to the decisions, both State and Federal, upholding the validity of statutes regulating the rates and charges of public utilities in general and certain industries "affected with a public interest," and those upholding the constitutionality of statutes prohibiting trusts and monopolies, and making unlawful all contracts and conspiracies in restraint of trade and commerce, generally referred to as anti-trust statutes, designed to preserve free competition, there is also another class of cases upholding the validity of statutes regulating contracts between employer and employee. One of the earliest of this latter class of cases is the case of Holden v. Hardy, 169 U. S. 366, 42 Law Ed. 780, 18 S. C. 383. In that case, handed down by the Federal Supreme Court over forty years ago, it was held that the protection of the health and morals, as well as the lives, of its citizens, is within the police power of a State Legislature, and that a statute of Utah, limiting the employment of workmen in underground mines, or in smelting of ores, to eight hours per day, was a valid exercise of the police power; that although the parties were of full age, the em-

ployer and employee in such industries did not stand upon an equality, and the public health demanded that the employee should be protected against himself. A recent decision of the same high tribunal, the case of West Coast Hotel Co. v. Parrish, 300 U. S. 379, 81 L. Ed. 703, 57 S. Ct. 578, 108 A. L. R. 1330, followed the same principle, and held constitutional a statute of the State of Washington which authorized the fixing of reasonable minimum wages for women and minors, by State authority, which should be adequate for the decent maintenance of women workers, upon the recommendation of a conference composed of representatives of employers and employees and of the public. In the majority opinion the several former decisions of the Court, dealing with the extent to which the police power may be exercised in cases involving statutes regulating and limiting freedom of contract as between employers and employees were reviewed, and one of them, the case of Adkins v. Children's Hospital, 261 U. S. 525, 67 L. Ed. 785, 43 S. C. 394, 24 A. L. R. 1238, was overruled, and I think properly so. The reasons given in this, and former decisions of our highest court, why the police power may be exercised to protect the health of women and children from unreasonably long working hours and at unreasonably small wages, are to my mind cogent and just.

But we are not here dealing with a statute falling within the class of statutes dealt with by the United States Supreme Court in the cases referred to in the preceding paragraph. We are dealing with an Act which authorizes the appointment by the Governor of a board of seven members, three of whom shall be chosen from those engaged in the dry-cleaning, dyeing and pressing industry, and three from those engaged in the laundry business, and one member to represent the general public, and vested with authority to fix the prices to be charged by such industries. No power

is given by the Act to fix the minimum of wages nor the maximum of hours of labor of the persons employed in these industries. There are quite a few cases holding that certain practices of industries of this kind may be regulated under the police power, but there are very few, if any, decisions by a court of last resort, holding that this power of regulation may be extended to the fixing of prices to be charged by such industries. The weight of authority is to the effect that this may not be done; that to do so constitutes an unnecessary, unreasonable and arbitrary invasion of that freedom of contract which is guaranteed by the Constitution, the maintenance of which is the foundation of economic liberty in this country.

This question was, as I see it, settled by the decision rendered by this Court some two years or more ago in the case of State, *ex rel.* Fulton, v. Ives, 123 Fla. 401, 167 So. 394, in which this Court held the price-fixing power of the Board of Barber Examiners, as attempted to be vested in them by Chapter 16799 of the Acts of 1935, to be unconstitutional; that is, it was settled unless the Court should now overrule that decision. In the able majority opinion in that case, Mr. Chief Justice ELLIS, among other things, said:

"Freedom of contract is the general rule; restraint is the exception and when it is exercised to place limitations upon the right to contract the power when exercised must not be arbitrary or unreasonable and it can be justified only by exceptional circumstances. *Ex Parte* Messer, 87 Fla. 92, 99 South. Rep. 330.

"While it is undoubtedly true that it is within the power of government to restrain some individuals from all contracts and all individuals from some contracts, the truth must not be ignored that a citizen's right to pursue any lawful business if 'property' and the right to contract for per-

sonal services as a means for the acquisition of property is one of the privileges of a citizen of the United States of which he cannot be deprived without invading his right to liberty. See State, *ex rel.* Davis, v. Ross, 97 Fla. 710, 122 South. Rep. 225; Paramount Enterprises v. Mitchell, 104 Fla. 407, 140 South. Rep. 328.

\* \* \*

"The case of People v. Logan, 284 Ill. 83, 119 N. E. Rep. 912, was cited as authority for the proposition that because the 'trade of a barber brings him in direct contact with the persons of his patrons, and careless and unsanitary practices in his trade may induce disease of the skin. \* \* \* It cannot be said that the *reasonable* regulation of the trade of a barber has not relation to the health and safety of the public.' (Italics supplied.)

"That authority may be sufficient to justify the enactment of Chapter 14650, Laws of Florida, 1931, defining the practice of barbering and requiring a license or certificate of registration as a condition precedent to practicing the trade and creating the Board of Barber Examiners, etc.

"Whether the additional powers attempted to be conferred upon the Board of Barber Examiners by Chapter 16799, *supra,* Acts 1935, is a valid exercise of the police power is a different matter.

"There is no controversy here, nor is there any doubt about the proposition, that the liberty of contract is not absolute and universal; that it is subject to the police power of the State to place restrictions upon it in the interests of the general welfare. There is no need to cite authority other than our own decisions upon this proposition. Everglades Sugar & Land Co. v. Bryan, 81 Fla. 75, 87 South. Rep. 58; State, *ex rel.* Davis, v. Rose, *supra;* Whitaker v. Parsons, 80 Fla. 352, 86 South. Rep. 247.

"Mr. Justice WHITFIELD, speaking for the Court in the case last cited, embodied the doctrine in a very few words as follows: 'Individual rights to life, liberty and property are in law acquired and enjoyed, subject to the exercise of the regulating powers of government; and such rights are not protected by the Constitution from the due exercise of such governing powers. The purpose of constitutional government is to secure individual rights subject to valid regulations enacted in the interest of the public good.'

"It is also true that the courts are the final judges as to what are proper subjects of the police power and the law-making power cannot arbitrarily make that a subject of its exercise which from its nature is not one. City of Jacksonville v. Ledwith, 26 Fla. 163, 7 South. Rep. 885, 23 Am. St. Rep. 558, 9 L. R. A. 69.

"It has been said that the police power of the State embraces its whole internal affairs and its civil and criminal polity. It extends to the protection of the lives, health and property of the citizens and to the preservation of good order and public morals. Prigg v. Pennsylvania, 16 Pet. (U. S.) 539, 10 L. Ed. 1060; Boston Beer Co. v. Mass., 97 U. S. 32, 7 Otto. 25, 24 L. Ed. 989; Slaughter-House Cases, 15 Wall. (U. S.) 36, 21 L. Ed. 394.

"The police power is broad and extensive. It may be exercised for preserving the public health, safety, morals or general welfare and its regulations may reasonably limit the enjoyment of personal liberty including the right of making contracts. The Supreme Court of the United States has invariably so held. See Holden v. Hardy, 169 U. S. 366, 18 Sup. Ct. Rep. 383, 42 L. Ed. 780; Chicago B. & O. R. Co. v. McGuire, 219 U. S. 549; 31 Sup. Ct. Rep. 259, 55 L. Ed. 328; Gibbons v. Ogden, 9 Wheat 1; 6 L. Ed. 23; License Cases, 5 How. 504, 12 L. Ed. 256; New York v. Niln, 11 Pet. 102, 9 L. Ed. 648.

"Mr. Justice ROBERTS, in the case of Nebbia v. New York, 291 U. S. 502, 54 Sup. Ct. Rep. 505, 78 L. Ed. 840, quoted the language of Mr. Justice BARBOUR in New York v. Niln, *supra,* to the effect that 'it is not only the right, but the bounden and solemn duty of a State, to advance the safety, happiness and prosperity of its people, and to provide for its general welfare, by any and every Act of legislation, which it may deem to be conducive to these ends.'

"In all cases, however, in which that wholesome constitutional doctrine has been announced it must not in the interest of constitutional liberty be forgotten that the regulations adopted in the exercise of the great power must be deemed to be fairly necessary to secure some object directly affecting the public welfare. . The Fourteenth Amendment debars the States from striking down personal rights, which, of course, include the right to make contracts for personal service, except as may be incidentally necessary for the accomplishment of some other paramount object and one that concerns the public welfare."

\* \* \*

"Certain kinds of business may be prohibited and the right to pursue a calling may be conditioned. Mr. Justice ROBERTS in the Nebbia case, *supra,* in a footnote to his opinion, cites a number of such vocations. It that case contracts for the sale of milk by local dealers were restricted by limitations upon the price to be charged and the regulation was upheld. The production of milk in the State of New York was deemed to be of such paramount importance that the public welfare and prosperity of the State in a very large and real sense depended upon it. The power to regulate it, a private business, could be invoked only under the special circumstances in which the property or general health of the entire State in a large measure de-

pended upon it. See New State Ice Co. v. Liebmann, 285 U. S. 262, 52 Sup. Ct. Rep. 371, 96 L. Ed. 747.

"The Legislature cannot decide the question of emergency and regulation free from judicial review. The legitimacy of the conclusions drawn from the facts is a matter for consideration by the court."

"It may be admitted that the barber trade in some respects bears an analogy to the profession of law, medicine, dentistry, osteopathy and other occupations which require on the part of the practitioner a degree of scientific training, knowledge of hygiene and manual skill necessary to efficient service, yet such professions may not, under the guise of protecting the public, be arbitrarily interfered with by the imposition of unreasonable and unnecessary restrictions. To impose such restrictions as are attempted by the Act in question would be to impose limitations upon certain essentials of liberty, particularly that of contract, with which the State is not entitled to dispense under the form of government which we now enjoy.

"The principle underlying the Act is a species of socialistic leveling of merit or capacity in the practitioner wholly inconsistent with the American ideal of encouragement to the worthy and industrious, by placing a handicap upon the proficient artist in the trade who would be in a measure coerced by the minimum price fixed for barber service which may be charged by one who under the provisions of Chapter 14650, *supra,* is equally qualified to practice the trade, to charge a price in reality inadequate to compensate him reasonably for the character of service he is capable of rendering. On the other hand the minimum price fixed by the Board actually interferes with the liberty of the efficient and highly skilled barber to contract with his patron for the rendition of a much needed service in the matter of beard cutting, hair trimming and facial massage.

"So the question is reduced to the narrow limitations of the State-wide necessity of fixing a minimum price for barber service in the interest of public health and welfare or the preservation of a trade which may be said to constitute a paramount industry of the State. We perceive no elements in the trade which make it an industry of paramount importance to the State peculiarly different from those contained in other like businesses where the element of personal service is sought from skillful practitioners."

"The obvious purpose of the Act was to enable the Board of Barber Examiners to set up a code for the government of the trade without any approval by any department and without setting up any standards aside from the opinion of the Board as to what is necessary to secure to the 'average barber' and his family suitable nourishment and maintenance. The analogy is almost perfect with the case of Schechter v. U. S., 79 L. Ed. 1570, 295 U. S. 495. See also State v. Fowler, 94 Fla. 752, 114 South. Rep. 435; State v. Duval County, 76 Fla. 180, 79 South. Rep. 692, relating to the delegation of legislative power.

"No emergency exists to justify such an extraordinary bit of legislation even measured by the alleged findings of facts by the legislative department and recited in the first section of the Act. The conclusion attempted to be reached that the legislation is justified in the interest of public welfare, health and morals has been shown to rest upon one supposition piled upon another which coincides with no known facts or other probable hypotheses. Such a regulation could be justified only upon the fact that the barber trade is a paramount industry of the State intimately connected with its welfare so that the State may through an agency such as the Board of Barber Examiners prescribe prices for the service to be rendered by each barber.

\* \* \*

"What this legislation undertakes is not regulation, but management, control, dictation. The Legislature may not by its fiat convert a private business into a public utility."

\* \* \*

"Reduced to its last analysis the thought underlying the Act seems to be, not that the barber trade is a paramount industry affecting the general welfare, but that the prosperity of the barber class sufficient to maintain the average barber and family 'properly' is a sufficient reason for the exercise by the State of the power of direction, control and management of the barber business in the interest of health, and morals. And further, that the liberty of contract enjoyed by every barber engaged in his vocation is used by him or is likely to be so used by him as to imperil the business and jeopardize the public health, morals and general welfare.

"We find in none of the cases support, directly or indirectly, of such a notion of democratic government or constitutional liberty."

I have quoted at length from the majority opinion in the Ives case, because the principles stated therein apply with even greater force to the price-fixing features of the statute now before us.

The writer wrote a special concurring opinion in that case, to the effect that the price-fixing features of the Act were unconstitutional upon the ground that the Act required the Board to fix a flat scale of prices to apply to an entire county, or to the entire State, which could not reasonably and justly be done on account of the varying conditions affecting the reasonableness of such prices which existed in the different sections of the State, or even within the confines of a single county; that this alone was sufficient to make the price-fixing powers unconstitutional, and that I did not deem it necessary to place the decision

on any other ground. As shown by that opinion, the writer hesitated to rule upon the general question of the legislative power to regulate the prices to be charged by barbers on account of the "very real relation" of that vocation to the public health, which was recognized by the Act by incorporating many provisions designed to raise the standards of sanitary conditions and efficiency in barbering work, among them those provisions requiring certain educational qualifications for apprentices, and by requiring examinations on various scientific subjects relating to hygiene, sanitation and antiseptic massage, as a prerequisite to registration, which matter was referred to in the dissenting opinion of Mr. Justice BUFORD.

But the Act now under review does not contain any provisions of that character, and the businesses dealt with are not so intimately related to the public health as is the work of the barber. Indeed, their relation to the public health is rather remote, and no greater than that of many other ordinary businesses in this State. This is indicated by the Act itself, which eliminates "wash-women" from its regulations, and also eliminates from its application counties containing nearly one-third of the State's population, and does not contain any provision setting up even a minimum of sanitary conditions to be maintained by these industries in the counties where it applies. While, in brief general terms, the Act gives the Board power to make "health and sanitation requirements" (and many other powers of other sorts in broad general terms) it gives no hint of what they shall be, nor does it set forth any general principle or standard by which action under this delegated legislative power should be exercised or measured. This appears to be in conflict with the case of State v. A. C. L. R. Co., 56 Fla. 617, 47 So. 969, dealing with the question of how far and in what way legislative power may be delegated. See also

United States v. Schechter, 295 U. S. 495, 79 L. Ed. 1570, and the concurring opinion of Mr. Justice Cordozo therein.

Appellees rely strongly upon certain observations made in the opinion rendered in the case of Bon Ton Cleaners & Dyers, Inc., v. Cleaning, Dyeing & Pressing Board, 128 Fla. 533, 176 So. 55, but those observations with reference to the effect of two recent decisions of the Federal Supreme Court were manifestly not intended to commit this Court to any departure from its previous decision in State, *ex rel.* Fulton, v. Ives, and the court below was in that case affirmed on another ground, not involved in the Ives case, nor in the case at bar. One of the two federal decisions referred to in the opinion was the case of West Coast Hotel Co. v. Parrish, *supra.* We have already shown what the actual holding in that case was. The other was the case of Highland Farms Dairy, Inc., v. Agnew, 300 U. S. 608, 81 L. Ed. 836, 57 S. Ct. 549, wherein the United States Supreme Court sustained the constitutionality of the Virginia statute establishing a milk commission with power to create natural market areas and to fix the minimum and maximum prices to be charged for milk and cream therein. Neither of these cases dealt with price-fixing in such business as those sought to be regulated by the statute now before us.

The only case in which this Court has ever sustained the power of the Legislature to regulate and fix prices in industries or businesses, other than those which might be classed as public utilities, was in the case of Miami Home Milk Producers Asso'n v. Milk Control Board, 124 Fla. 797, 169 So. 541, in which this Court upheld the Florida statute (Chapter 17,103, Acts of 1935) establishing the Milk Control Board and vesting it with power to fix and regulate the price of milk. We were there dealing with a statute regulating the price of a valuable food product of practically universal consumption throughout the State; one of

the prime necessities of life to tens of thousands of our very young children, and a necessary article of diet to many who were afflicted with certain classes of diseases or invalidism, and generally used as a part of their daily food by the vast majority of our people of all ages. Furthermore, it was a product peculiarly liable to contamination and adulteration. We had held in Logan v. Aliferi, 110 Fla. 439, 148 So. 872, that the business of producing and selling milk was of such prime importance to the public health as to authorize very strict regulation under the police power.

Our decision in Miami Home Milk Producers Asso'n v. Milk Control Board, *supra,* was based largely upon the vital relation of that industry, as a paramount industry of the State, to the public health, making its preservation essential to the general public welfare; citing as authority the case of Nebbia v. New York, 291 U. S. 502, 54 S. C. 505, 78 L. Ed. 940; affirming the decision of the Court of Appeals of New York sustaining the constitutionality of a substantially similar statute which had been adopted by the New York Legislature; also cases from the courts of last resort in Virginia and several other States upholding the validity of substantially similar statutes. As pointed out in the opinion of this Court in the Milk Control Board case, the holding therein was not in conflict with the decision in the case of State, *ex rel.* Fulton, v. Ives, *supra,* for the reasons therein stated. The laundry and dry-cleaning businesses, useful, serviceable and convenient though they be, are not basic or paramount industries, nor do they have anything like that vital relation to the public health which characterizes the production, distribution and sale of milk and cream. Legislative findings to the contrary in the preamble to the statute cannot blind this Court to those matters of common knowledge of which the courts are authorized to take judicial knowledge. This Court has said that what everybody

knows, the courts are presumed to know. While we should and do indulge all reasonable presumptions in favor of legislative findings, we must nevertheless face the realities, the actual facts, which are matters of common knowledge, with regard to the nature and character of the businesses here involved, and act in accordance therewith. This principle has often been announced by this Court in the past, and was reasserted in the Milk Control Board case.

The contention that the present case should be affirmed on the authority of the Nebbia case, *supra,* and our Milk Control Board case is therefore not tenable. This is clearly shown by the decisions of the New York Court of Appeals subsequent to its decision in the Nebbia case. See Doubleday, Doran & Co. v. Macy & Co., 269 N. Y. 272, 199 N. E. 409, and Darweger v. Staats, 267 N. Y. 290. In the latter case, commenting on the Nebbia case, Chief Justice CRANE said:

"The briefs place much emphasis upon Nebbia v. New York (291 U. S. 502), People v. Nebbia ( 262 N. Y. 259), and claim that this is an authority to sustain legislation fixing the price of any commodity—shoes, clothes, coal, hardware or anything else that may strike the Legislature's fancy, provided an emergency be declared. The fixing of the price of milk in the Nebbia case was a mere incident to other regulations which tried to meet an abuse growing up to the detriment of the farmer and his stock. This control of the output protected the very vitals of the industry, and it would not have been a far step to have held, as perhaps it was intimated, that the milk industry was one touched with a public interest, such as water, electricity, grain and the like. To say that the Nebbia case is an authority for the Legislature to fix the prices of all commodities is not justified by the decision. What the legislative power may be in a given

case regarding any industry we do not undertake to say. Sufficient unto the day is the power thereof."

After our decision in the Barber Board case, State, *ex rel.* Fulton, v. Ives, was rendered, the Court of Appeals of Alabama, in City of Mobile v. Rouse, 173 So. 354, held that an ordinance of the City of Mobile regulating the charges for services of barbers in that city and fixing a minimum scale of prices, was unconstitutional. In the able opinion of Presiding Judge BRICKEN, the case of State, *ex rel.* Fulton, v. Ives was cited with approval. This case was taken by certiorari to the Supreme Court of Alabama, which in an able opinion by Mr. Justice BROWN affirmed the decision of the Court of Appeals. See 173 So. 266, 233 Ala. 622, 111 A. L. R. 349, one of the seven Justices dissenting. However, the same court had upheld the constitutionality of the Act establishing the Alabama Milk Control Board on the ground that the milk industry was affected with a public interest. Franklin v. Ala. Milk Control Board, 232 Ala. 637, 169 So. 295.

Counsel for the Dry Cleaning & Laundry Board cite in support of their contentions the case of United States v. Spotless Dollar Cleaners, 6 Fed. Supp. 725, a decision rendered by a United States District Court in New York, which they say was never appealed. This decision held valid the scale of prices fixed by a code prepared for the cleaning and dyeing trade under the National Industrial Recovery Act. Counsel for appellants say that the reason this case was not appealed was because President Roosevelt promptly revoked the power of price fixing contained in the code upon the report of the Commissioners Advisory Board, rendered April 25, 1934, leaving therein only those provisions which permitted the regulation of wages and hours, doubtless concluding that the fair exercise of that power would prevent unfair competition; that this report showed that the price

increases made under these price regulations had been resented by customers and had brought about a sharp decrease in the volume of business. Copious extracts from this report are quoted in the brief, but space forbids any further comment thereon.

Without further lengthening this opinion by an analysis and discussion of the many cases dealing with the subject, I think it may be safely stated that according to the weight of authority, the power of government to fix prices does not exist with respect to merely private property or business, but only exists where the business or property involved is "affected with the public interest." Likewise, the term "affected with a public interest" has been given various interpretations and applications.. The decisions of the courts are not all in accord by any means on this subject. As stated in Miami Home Milk Producers Association v. Milk Control Board, the outstanding cases decided by the Federal Supreme Court dealing with the question of the power of a State to regulate prices in industries other than those usually classed as public utilities are probably the following: Mun v. Illinois, 94 U. S. 113, 24 L. Ed. 77; German Alliance Insurance Co. v. Lewis, 233 U. S. 389, 34 S. C. 612, 58 L. Ed. 1011; Wolff Packing Co. v. Kansas, 266 U. S. 522, 67 L. Ed. 1103; Tyson v. Danton, 273 U. S. 418, 47 S. C. 426, 71 L. Ed. 718, 58 A. L. R. 1236, and the Nebbia case, *supra.* To this list of cases might be added New State Ice Company v. Liebmann, 285 U. S. 262, 76 L. Ed. 747; Fairmont Creamery Co. v. Minnesota, 274 U. S. 1, 71 L. Ed. 893; Williams v. Standard Oil Company, 278 U. S. 235, 49 S. Ct. 115, 73 L. Ed. 287, 60 A. L. R. 596. A vast number of cases will be found and cited on the question of what businesses may properly be held to be affected with a public interest, in 11 Am. Jur. 1058, to 1064, which will show that no particular formula or test has ever been unanimously agreed upon as final

or conclusive. But when a business has been found to be one affected with a public interest, the Legislature may make all such reasonable regulations as it may deem necessary for the protection of the public in its relations with those who carry on businesses thus affected. 11 Am. Jr. 1065. And when a business has been devoted to a public use, it will be subject to public regulation both as to its use and as to the compensation to be paid for it; such for example as the charges of the railroad companies and other common carriers; grain elevators, warehousemen, telephone and telegraph companies. See Section 310 of Art. XVI of our Constitution. Then there are also certain regulations of the shell-fish and oyster industry; salt water and sponge fisheries; regulations for the inspection of fruits and vegetables; petroleum products, etc., for the protection of public health and the conservation of natural resources; but these regulations do not include price fixing. An examination of the cases will show that it is not every business or profession which has been subjected to police regulation which may also be subjected to the legislative fixing of prices to be charged. We have many professions, vocations and businesses in this State which are under our statutes subject to more or less strict police regulations, such for instance as all those above mentioned, and also doctors, lawyers, osteopaths, chiropractors, beauticians, optometrists, public accountants, civil engineers, banking, trust companies, hotels and restaurants, insurance brokers, etc., and so on; but the mere fact that the Legislature has seen fit to regulate these professions, vocations and businesses does not mean that the power to fix prices charged therein is vested in the Legislature. As was said in that same chapter of American Jurisprudence on Constitutional Law, 11 Am. Jr. 1077-78:

"The mere assertion by the Legislature that a statute re-

lates to the public health, safety or welfare does not in itself bring that statute within the police power of a State, for there must always be an obvious and real connection between the actual provisions of a police regulation and its avowed purpose and the regulation adopted must be reasonably adapted to accomplish the end sought to be attained. A statute or ordinance which has no real, substantial, or rational relation to the public safety, health, morals,.or general welfare is a palpable invasion of rights secured by. the fundamental law and cannot be sustained as a legitimate exercise of the police power. One application of the familiar rule that the validity of an Act is to be determined by its practical operation and effect, and not by its title or declared purpose, is that a constitutional right cannot be abridged by legislation under the guise of police regulation. The exercise of the power must have a substantial basis and cannot be made a mere pretext for legislation that does not fall within it. The Legislature has no power under the guise of police regulations, arbitrarily to invade the personal rights and liberty of the individual citizen, to interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations, or to invade property rights."

In the case of Becker v. State, a Delaware case rendered in 1936, 185 Atl. 92, it was held that the dry cleaning business was not affected with a public interest, and that considerations of public health were so remote as to be negligible; that a vast authority was centered by the Act in a governing board, a majority of which were directly interested in the industry and sit in judgment over fellow members of the trade; that the practical tendency of the legislation was to create and foster monopoly, to prevent and not to encourage competition, and to maintain maximum, not minimum prices, all of which is against and not in the interest of the consuming public. The Delaware Court held

that such a business was not so affected with a public interest as to justify such price regulations. To like effect see Kent's Stores v. Wilentz (N. J. 1936) 14 Fed. Supp. 1.

In the recent case of the City of Mobile v. Gibson, 173 So. 264, the Court of Appeals of Alabama held that an ordinance of the City of Mobile, fixing prices for the pressing and cleaning of clothes, was unconstitutional, on the authority of the Rouse case, 173 So. 254, and on certiorari to the Supreme Court of Alabama, the action of the Court of Appeals was affirmed in March of 1937. See 173 So. 266.

The grocery business (Balzar v. Caler [Ca. 1] 74 Pac. [2nd] 839) and the Employment Agency Business (Ribnik v. McBride, 277 U. S. 350, 72 L. Ed. 913, 48 S. C. 545) were held not affected with a public interest.

The mere existence of unfair trade competition and destructive price wars, as stated in the legislative findings, are not of themselves sufficient to authorize the Legislature to fix the prices to be charged in businesses that are not affected with a public interest. There are ways of preventing unfair and destructive competition other than those which involve the complete destruction of competition. At the time this opinion is written, the newspapers report the strenuous activities of the Federal Department of Justice to prevent competition in the oil industries, and also in the motion picture industry, which has resulted in the indictment of a number of prominent persons connected with the operation of those industries. These prosecutions, so it is reported, are for violations of the Sherman Anti-Trust Act, which prohibits all contracts in restraint of trade in interstate commerce. We have a similar Act in this State, which was adopted in 1915 and amended in 1925, which prohibits combinations for the purpose of creating or carrying out restrictions in trade or commerce, or the free

pursuit of any business authorized or permitted by the laws of this State, or to prevent competition in the making, transporting, sale or purchase of merchandise, produce or commodities; for the making or carrying out of any contract or agreement to keep the price of any article, commodity or transportation at a fixed or graduated figure, or by which they shall in any manner establish or settle the price of any article or commodity between themselves and others to preclude a free and unrestricted competition among themselves or others, etc.

There is a serious question in this case whether this Act, by exempting from its operation a large number of counties of the State, in which counties the burdens and regulations imposed by this Act upon those engaged in the laundry and dry cleaning business are not operative, does not deny to persons engaged in such industries in the counties to which the Act does apply the equal protection of the laws. See State v. Justus, 90 Minn. 474, 97 N. W. 124; State v. City of Memphis, 266 S. W. 1038; Randolph v. State, 117 Tex. Crim. Rep. 80, 36 S. W. (2nd) 484. There is also a serious question as to whether or not this Act vests the board with such broad powers, and in such general terms, "to supervise and regulate the entire cleaning, dyeing, pressing and laundry industry of the State of Florida," does not as to some of its provisions, amount to an unconstitutional delegation of legislative power, under our own decisions as well as those of the United States Supreme Court, such as the Schechter case, *supra,* including the illuminating concurring opinion of Mr. Justice CORDOZO in that case, and also the case of Panama Refining Company v. Ryan, 293 U. S. 388, 55 S. C. 241, 79 L. Ed. 446. However, it is not necessary to discuss these questions, as in my opinion the overwhelming weight of authority in this country shows

that the price-fixing features of this Act are unconstitutional.

The Constitution certainly does not contemplate that the bars shall be completely thrown down to the unlimited regulation and control by the State of private business, including the fixing of prices. The line must be drawn somewhere, sometime, between those businesses which are so clearly affected with a public interest that they may thus be so drastically controlled and regulated by the State, and those which may not; even if that line may have to be drawn gradually by the slow process of judicial inclusion and exclusion to cases as they arise. The right constitutional balance between the personal and economic liberty of the individual, as guaranteed by the Constitutions, both State and Federal, and the legitimate exercise of the police power in the interest of the public health, safety, morals and general welfare, must be maintained if our form of government is to endure. In the Ives case, this Court held that there was a limit beyond which the Legislature could not go, and that, as to price fixing legislation as applied to private business, the Legislature could not constitutionally exercise that power except when dealing with some basic or paramount industry which vitally affects the public health and welfare of the general public of the State. If we are to depart from this general principle, and open the flood-gate for legislative control or regulation of prices in any private business or avocation which the Legislature shall state in the Act is for the public health or welfare, let the people first pass on this momentous and far-reaching question by the adoption, or the refusal to adopt, a constitutional amendment on the subject, if the proponents of this departure from our previous construction of the constitutional guarantees see fit to secure the submission of such an amendment.

In the meantime, I think this Court should stand by and adhere to the principles laid down in our previous decisions in the case of State, *ex rel.* Fulton, v. Ives and Miami Home Milk Producers Asso'n v. Milk Control Board. And if we do this, we must, as I see it, hold the price-fixing powers of the Act now under review unconstitutional, and reverse the decree of the lower court.

### ON PETITION FOR REHEARING.

WHITFIELD, P. J.—The Miami Laundry Company is a corporation chartered by the State of Florida with authority among other things:

"To carry on the business of a steam or electric or hand or general laundry, and to wash, clean, purify, scour, bleach, wring, dry, iron, color, dye, disinfect, dry clean, renovate and prepare for use all articles of wearing apparel, household, domestic and other linen, cotton and woolen goods and clothing and fabrics of all kinds."

In performing the authorized services, the company necessarily has entire control and custody of the articles entrusted to it, and also determines how and by what means the articles will be laundered or otherwise treated or processed, the owners of the articles having no control or direction in the premises.

The service is performed under a charter granted by the State to the laundry company. The charges relate to separate single articles. Individual actions to redress abuses and unjust charges in performing the service would be ineffectual and oppressive.

Statutory regulation of the service, and of the charges therefor, are important for the public welfare; and such regulation is expressly provided for by the State Constitution. Sec. 30, Art. XVI.

The organic provision affords due process of law unless the statutory provisions or the administrative regulations thereunder are shown to be abuses or arbitrary exertions of governmental powers or authority conferred pursuant to the organic provision above cited.

The statute, Chapter 17894, Acts of 1937, provides for regulations of rates or charges as well as for sanitary and other matters in performing the authorized service.

The legality of statutory regulations of a business involving liberty of contract or other property rights, is to be determined by authorized tribunals upon due consideration of the nature, method, extent and reasonableness of the regulations, with reference to the matter regulated, to the demands and interest of the public in the service, and to the limitations of the controlling Federal or State law, to the end that private rights may not be invaded or restrained except as may be permitted by the paramount law and may be necessary and appropriate to conserve the general welfare; that being among the purposes for which government is established and maintained.

Obviously the laundry service as rendered has direct relation to the health, safety, comfort and welfare of the public who patronized the company. It is also obvious that in furnishing sanitary and efficient facilities for performing the service to the public, the expense reasonably incurred to conserve the health, convenience and welfare of the public, justify reasonable regulations of rates for the service. Charges made are important to the company and to the public, requiring governmental regulation for the good of all concerned. As recognized and provided for in the statute, the essential factors in determining a just and reasonable charge for service rendered may differ in localities because of controlling conditions, making reasonable and just regulations of the service and the charges

therefor a proper governmental function as contemplated by the State Constitution as well as by general law.

Manifestly the public who are patrons of the company have a material interest in the proper rendering of the service, and its nature is such as to justify if not to require governmental regulation to conserve the public health and welfare. 51 C. J. 4, *et seq.* Certainly Section 30, Article XVI, of the Florida Constitution authorizes appropriate statutory regulations of the service including the charges therefor, to the end that there be no abuses, unjust discriminations or excessive charges by those performing the service.

Section 30, Article XVI, of the Florida Constitution was a factor in the decision in City of Tampa v. Tampa Water Works Co., 45 Fla. 500, 34 So. 631, affirmed in 199 U. S. 241, 26 Sup. Ct. 23, 50 L. Ed. 170; and in Southern Utilities Co. v. Palatka, 86 Fla. 583, 99 So. 236, 268 U. S. 232, 45 Sup. Ct. 488, 69 L. Ed. 930. See also Oklahoma Operating Co. v. Love, 252 U. S. 331, 40 Sup. Ct. 338, 64 L. Ed. 596.

The Supreme Court of the United States has announced the following:

"Businesses said to be clothed with a public interest justifying some public regulation may be divided into three classes:

"(1) Those which are carried on under the authority of a public grant of privileges which either expressly or impliedly imposes the affirmative duty of rendering a public service demanded by any member of the public. Such are the railroads, other common carriers and public utilities.

"(2) Certain occupations, regarded as exceptional, the public interest attaching to which, recognized from earliest times, has survived the period of arbitrary laws by Parlia-

ment or Colonial Legislatures for regulating all trades and callings. Such are those of the keepers of inns, cabs and grist mills. State v. Edwards, 86 Me. 102; Terminal Taxicab Co. v. District of Columbia, 241 U. S. 252, 254.

"(3) Businesses which though not public at their inception may be fairly said to have risen to be such and have become subject in consequence to some government regulation. They have come to hold such a peculiar relation to the public that this is superimposed upon them. In the language of the cases, the owner by devoting his business to the public use, in effect grants the public an interest in that use and subjects himself to public regulation to the extent of that interest although the property continues to belong to its private owner and to be entitled to protection accordingly. Munn v. Illinois, 94 U. S. 113; Spring Valley Water Works v. Schottler, 110 U. S. 347; Budd v. New York, 117 N. Y. 1, 27 S. C., 143 U. S. 517; Brass v. Stoeser, 153 U. S. 391; Noble State Bank v. Haskell, 219 U. S. 104; German Alliance Assurance Co. v. Lewis, 233 U. S. 389; Van Dyke v. Geary, 244 U. S. 39, 47; Block v. Hirsh, 256 U. S. 135.

"It is manifest from an examination of the cases cited under the third head that the mere declaration by a Legislature that a business is affected with a public interest is not conclusive of the question whether its attempted regulation on that ground is justified. The circumstances of its alleged change from the status of a private business and its freedom from regulation into one which the public have come to have an interest are always a subject of judicial inquiry." Wolff Co. v. Industrial Court, 262 U. S. 522, text 535, 43 Sup. Ct. 630, 67 L. Ed. 1103.

This case comes under the third class as above stated and also under Section 30, Article XVI, of the Florida Con-

stitution; and the regulating statute is not an arbitrary abuse of legislative power.

Under the Fourteenth Amendment of the Federal Constitution, due process of law as interpreted by the Federal Supreme Court controls in State regulation of business involving liberty and property rights; and the courts of Florida follow the Federal Supreme Court decisions in such matters.

The *then* controlling Federal rule as to limitations upon liberty of contract and property rights when a business claimed to be "affected with a public interest," is sought to be regulated as in Adkins v. Children's Hospital, 261 U. S. 525, 43 Sup. Ct. 394, 67 L. Ed. 785, was followed and applied in State v. Ives, 123 Fla. 401, 167 So. 394. There were also other fundamental defects in the statute in the Ives case. Since then the Federal rule has been modified, and it is now more in harmony with Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77; Oklahoma Operating Co. v. Love, 252 U. S. 331, 40 Sup. Ct. 338, 64 L. Ed. 596; with the principles stated in Wolff Co. v. Industrial Court, 262 U. S. 522, 43 Sup. Ct. 630, 67 L. Ed. 1103, and with Section 30, Article XVI, of the Florida Constitution of 1885, which latter organic provision, as well as the modified Federal rule, was applied by this Court in the opinion in this case filed July 27, 1938. Among the latest opinions expressing the controlling Federal rule under the Fourteenth Amendment are Wolff Co. v. Industrial Court, 262 U. S. 522, 43 Sup. Ct. 630, 67 L. Ed. 1103; Townsend v. Yeomans, 301 U. S. 441, 57 Sup. Ct. 842, 81 L. Ed. 1210; Nebbia v. New York, 291 U. S. 502, 54 Sup. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469; Hegeman Farms Corp. v. Baldwin, 293 U. S. 163, 55 Sup. Ct. 7, 79 L. Ed. 259; Borden's Farm Products Co. v. Ten Eyck, 297 U. S. 251, 56 Sup. Ct. 453, 80 L. Ed. 669; West Coast Hotel Co. v. Parrish, 300 U. S.

379, 57 Sup. Ct. 578, 81 L. Ed. 703, 108 A. L. R. 1330; Highland Farms Dairy v. Agnew, 300 U. S. 608, 57 Sup. Ct. 549, 81 L. Ed. 835. See Miami Home Milk Producers Asso. v. Milk Control Bd., 124 Fla. 797, 169 So. 541; Bon Ton Cleaners & Dyers, Inc., v. C. D. & P. Bd., 128 Fla. 533, 176 So. 55.

The Constitutions, State and Federal, secure liberty of contract and property rights against arbitrary and oppressive governmental restraint, not against reasonable and just statutory regulations, restraints and prohibitions duly administered to conserve the best interests of the public affected by the regulations

Under Section 30, Article XVI, Constitution, the Legislature is invested with *full power* to pass laws for the correction of abuses and to prevent unjust discrimination and excessive charges by persons and corporations engaged as common carriers in transporting persons and property, or performing *other* (not similar) services of a public nature; and shall provide for enforcing such laws by adequate penalties or forfeitures. Railroad Com'rs v. Pensacola & A. R. Co., 24 Fla. 417, 5 So. 129, 12 Am. St. Rep. 220, 2 L. R. A. 504; State v. A. C. L. R. Co., 56 Fla. 617, 47 So. 969, 32 L. R. A. (N. S.) 639; State, *ex rel.,* v. Burr, 79 Fla. 290, 84 So. 61; City of Tampa v. Tampa Water Works Co., 45 Fla. 600, 34 So. 631, affirmed in Tampa Water Works Co. v. Tampa, 199 U. S. 241, 26 Sup. Ct. 23, 50 L. Ed. 170; State v. F. E. C. Ry. Co., 57 Fla. 522, 49 So. 43; Gainesville G. & E. Power Co. v. Gainesville, 63 Fla. 425, 58 So. 785; So. Utilities Co. v. Palatka, 86 Fla. 583, 99 So. 236, 268 U. S. 232, 45 Sup. Ct. 488, 69 L. Ed. 930; State v. So. Tel. & Const. Co., 65 Fla. 270, 61 So. 506; State v. Peninsular Tel. Co., 73 Fla. 913, 75 So. 201; Town of Brooksville v. Fla. Tel. Co., 81 Fla. 436, 88 So. 307; State v. R R. Comm., 79 Fla. 526, 84 So. 444; Central Truck

Lines, Inc., v. R. R. Comm., 118 Fla. 555, 160 So. 26; Ortega Co. v. Triay, 260 U. S. 103, 43 Sup. Ct. 44, 67 L. Ed. 153; State, *ex rel.*, v. Jacksonville Terminal Co., 41 Fla. 377, 27 So. 225, 90 Fla. 721, 106 So. 576; 96 Fla. 295, 117 So. 869.

What are "other services of a public nature" is for statutory determination when no provision of organic law is violated; and, like other statutory classifications for intrastate regulations, if the Constitution is not violated, statutory regulations that are predicated upon an express or implied determination that a service being performed under the law is "of a public nature," should not be invalidated by the courts if there is any conceivable reasonable basis for such determination, the validity of particular regulations being subject to judicial adjudication.

The nature of the business in this case, as shown above, makes the industry subject to reasonable and appropriate regulations, including the fixing of reasonable and just charges for services rendered the public. The Constitution does not confine the contemplated regulations to common carriers of persons and property, but expressly extends the organic provision to "other services of a public nature." City of Tampa v. Tampa Water Wks. Co., 45 Fla. 600, 34 So. 631, 199 U. S. 241, 26 Sup. Ct. 23, 50 L. Ed. 170; So. Utilities Co. v. Palatka, 86 Fla. 583, 99 So. 236, 268 U. S. 232, 45 Sup. Ct. 488, 69 L. Ed. 930; Gainesville G. & E. Power Co. v. Gainesville, 63 Fla. 425, 58 So. 785.

Unless the Constitution is violated, statutory regulations control as to the classes and qualifications of those from whom members of a board shall be appointed to administer a law regulating the performance of "services of a public nature." It is not shown that the statutory provision as to the classes or qualifications of those from whom the Board in this case must be chosen, violates any express spe-

cific provision of the Constitution or that such statutory provision so operates as to deprive any person of a property right without due process of law, or denies to any person the equal protection of the laws, in violation of Sections 1 and 12 of the Declaration of Rights of the State Constitution or of the Fourteenth Amendment to the Federal Constitution. See opinion on rehearing in State, *ex rel.*, v. Coleman, filed at this term.

There is no unlawful delegation of legislative power in authorizing an administrative board to make rules and regulations for the execution of statutory provisions. R. R. Com'rs v. Pensacola & A. R. Co., 24 Fla. 417, 5 So. 129, 12 Am. St. Rep. 220, 2 L. R. A. 504; State v. A. C. L. R. Co., 56 Fla. 617, 47 So. 969, 32 L. R. A. (N. S.) 639.

The reasonableness of the charges fixed for service is not involved here.

While it does seem to be incongruous that six of the seven members of the Board to administer the law are to be appointed from among those who are engaged in performing the "services of a public nature" that are regulated, it is not shown that the Board so-constituted does or will in fact operate to deny to any person due process or equal protection of the laws in excessive charges or unjust discrimination or their abuses of governmental authority.

The circuit courts have general equity power to grant injunctions when the facts duly presented warrant it, and punishment for violating injunctions is as for contempt. The facts constituting criminal offenses must be defined and prescribed by law; the facts warranting an injunction are determined by equity courts as cases are presented. The subject expressed in the title of Chapter 17984 is sufficient to indicate that the regulations of the statute may be enforced by the civil remedy of injunction, that being "matter properly connected" with the subject expressed in

the title of the Act, though the title to the Act is not sufficiently comprehensive to make *criminal prosecutions and imprisonment* for violations of regulations under the statute "matter properly connected" with the title expressed in the Act, as held in State, *ex rel.,* v. Coleman, filed July 30, 1938.

In the recent Louisiana case of Board of Barber Examiners v. Parker (La.) 182 So. 485, there was no State organic provision as to regulating the performance of "services of a public nature," similar to Section 30, Article XVI, of the Florida Constitution; but there was a question of unjust discrimination, as there was in the Florida case of State v. Ives, though the latter case was decided mainly on the then more restrictive Federal rule as to restraints by the State of liberty and property rights under the due process of law clause of the Fourteenth Amendment to the Federal Constitution. In this case the statute applies to all counties of the State having over 17,500 population; and provides that "different prices may be reasonably fixed for different trade areas."

The Federal rules of decisions that were controlling and followed in the Ives case have been modified by the latest Federal Supreme Court decisions, and in some of them there was no organic State provision authorizing the regulation of rates or charges for "services of a public nature." In Schechter Corp. v. U. S., 295 U. S. 495, 55 Sup. Ct. 837, 79 L. Ed. 1570, 97 A. L. R. 947, the Act of Congress obviously violated the Federal Constitution.

The decision in this laundry service case is in harmony with the Federal decisions in the Munn case, 94 U. S. 113, 24 L. Ed. 77, and with the principles announced in Wolff Co. v. Industrial Court, 262 U. S. 522, 43 Sup. Ct. 630, 67 L. Ed. 1103, and in the Townsend case, 301 U. S. 441, 57 Sup. Ct. 842, 81 L. Ed. 1210, and other late Federal

Supreme Court cases; and accords with Section 30, Article XVI, of the Florida Constitution as interpreted by the Federal Supreme Court in the Tampa Water Works case, 199 U. S. 241, 26 Sup. Ct. 23, 50 L. Ed. 170. See also Oklahoma Operating Co. v. Love, 252 U. S. 331, 40 Sup. Ct. 338, 64 L. Ed. 596. See also Sections 7493 (5358), 6968 (488), 2745 C. G. L.

The service being rendered by the appellant has such relation to conservation of the public health, safety and welfare as to give the public served an interest in the service as performed, and a right to demand that the service shall be conducted with reasonable efficiency and for just and reasonable charges. See 51 C. J. 4, *et seq.* The Florida Constitution contemplates that if necessary to serve the public welfare, such service shall be performed under statutory regulations as to the *service and charges* within the limitations of paramount law.

Under Section 30, Article XVI, of the Constitution of 1885, State regulation extends to rates or charges for performing services of a public nature, as well as to abuses or unjust discriminations. Provisions in a *State Constitution* for rate regulation for intrastate services of a public nature afford due process of law unless the regulation is an abuse or arbitrary exercise of legislative power or of administrative authority under a statute.

The enactment here considered may not be regarded as a perfect legal production, but the essential features of the statutory regulations do not violate the Federal or State Constitution as contended, and it is not shown that the administrative rules, regulations and rates are unjust or unreasonable or other wise illegal.

TERRELL, BUFORD and CHAPMAN, J. J., concur.

ELLIS, C. J., and BROWN, J., dissent.

Brown, J. (dissenting).—I think a rehearing should be granted in this case for the reasons stated in my dissent to the majority opinion on the original hearing. Nor can I concur with the construction placed by the majority of the Court, in the above opinion on petition for rehearing, upon Section 30 of Artcile XVI of our Constitution. This construction seems to me to be in conflict with the *ejusdem generis* rule of construction, which has often been recognized and applied by this Court. This rule briefly stated is that where an enumeration of specific things is followed by some more general word or phrase, it will usually be construed to refer to things of the same kind or species as those specifically named. It is closely related to the even broader rule known as the *"Noscitur a sociis"* rule or maxim.

Ellis, C. J., concurs.